Cynthia L. Martin, Judge
Travone Shaw ("Shaw") appeals his convictions of felony stealing and an associated count of armed criminal action, and of involuntary manslaughter in the first degree and an associated count of armed criminal action. Shaw asserts that the trial court erred: (1) in entering judgment convicting Shaw of felony stealing and an associated count of armed criminal action because, pursuant to State v. Bazell , 497 S.W.3d 263 (Mo. banc 2016), Shaw could only have been convicted of misdemeanor stealing; (2) in entering judgment convicting Shaw of involuntary manslaughter in the first degree and an associated count of armed criminal action based on an accomplice theory because there was insufficient evidence to support the convictions; and (3) in using a verdict director that instructed the jury that it should find Shaw guilty of involuntary manslaughter in the first degree if it found that Shaw "acted together with or aided" another in committing the *684 offense. We vacate Shaw's convictions and sentences for felony stealing and the associated armed criminal action count. We remand with instructions to enter a judgment of conviction for the class A misdemeanor of stealing and for resentencing within the authorized range. We affirm the trial court's judgment in all other respects.
Factual and Procedural Background[1]
On October 29, 2014, Dionte Greene ("Greene") contacted Shaw through Facebook in an effort to set up a sexual encounter. Shaw used the name "Tra Da Gunner." Shaw and Greene continued communicating over Facebook into the early morning hours of October 30, 2014. While the exchange between Shaw and Greene began as conversational, Shaw eventually told Greene, "Stop inboxing me. You ain't trying to get robbed tonight." Just after 1:00 a.m., Greene gave Shaw his cell phone number. Telephone records show that Shaw's number called Greene's number shortly thereafter. Shaw and Greene resumed their conversation later that afternoon. The two discussed meeting to have a sexual encounter, and Shaw told Greene that he wanted marijuana. The two arranged to meet. Shaw later deleted the Facebook messages he exchanged with Greene.
Greene told his friend, James Dilworth ("Dilworth"), that he was going to meet with two men to "have sex." Greene and Dilworth texted each other and talked on the phone as Greene traveled to the meeting. When Greene arrived at the address he had been given, he first told Dilworth he did not see anyone, but then indicated that he saw two men. The two men were Shaw and Antonio Golston ("Golston"). Greene talked to the two men while he was on the phone with Dilworth. The men walked away, and Greene told Dilworth, "He looks cute just like his Facebook picture." The two men then returned to Greene's car and discussed marijuana. Dilworth heard Greene tell the men that if they gave him the money, he would buy marijuana for them.
Greene and the two men drove to a nearby gas station. Surveillance video footage from the gas station showed that Greene was the driver of a gold sedan, and that Shaw was in the front passenger seat. Shaw exited the car and entered the gas station. Shaw unsuccessfully attempted to withdraw money from an ATM. Shaw returned to Greene's vehicle, and the car drove away from the gas station to 6901 Bellefontaine, a known drug house.
At approximately 1:00 a.m. on October 31, 2014, two police officers in the neighborhood heard gunshots. The officers drove around the neighborhood, and observed a gold sedan parked at 6901 Bellefontaine. The vehicle's lights were on, and its engine was running. The officers parked their vehicle a block away and watched the vehicle to determine whether the vehicle was involved in any drug activity. After thirty minutes of seeing no activity, the officers discontinued surveillance of the vehicle and left the area.
The same officers received a call at approximately 4:30 a.m. about "a suspicious car and occupant" at 6901 Bellefontaine. The officers returned to the location and found the same gold sedan with its lights still on and engine still running. The car's windows were covered with moisture. The officers approached the gold sedan. Greene was sitting in the driver's seat, slumped over the center console, deceased.
Greene's hand was across his lap on top of a bag of potato chips. Greene's other hand was on top of the center console, *685 where Greene's wallet was found. The car's glove box was open. A crime scene technician found a shell casing on the right rear floorboard. An inactive cell phone belonging to Greene was found in the vehicle. An investigation revealed that Greene had an active cell phone that was never recovered. Latent prints lifted from the vehicle's exterior right front window belonged to Shaw.
An autopsy revealed that the cause of Greene's death was an injury to his brain from a gunshot wound to the head. The bullet entered into to the right of Greene's right eye, and traveled through the lower portion of Greene's brain, cutting Greene's brain stem in half before coming to rest in the right occipital lobe. Stippling on Greene's skin indicated that the gun was one to three feet away from Greene's head at the time it was fired.
In late October 2014, Shaw began speaking with Sha're Martin ("Martin") on Facebook. Martin gave Shaw her phone number, and the two spoke with one another using Facebook, text messages, and phone calls. Shaw used the "Tra Da Gunna" pseudonym when communicating with Martin on Facebook. Sometime after October 31, 2014, Shaw told Martin that he was afraid of being "locked up for twenty-five." Shaw told Martin that he was afraid that he was going to go to prison for something he did not do.
Police obtained cell phone data from Shaw's account, Golston's account, and Greene's account. That data indicated that all three men had communicated with one another via cell phone. The phone data also indicated that, shortly before the time of the homicide, all three phones used the same cell tower and sector.
In early November 2014, police arrested Golston. Once Golston was in custody, the police questioned him, and Golston "denied everything." Instead, Golston told the police "to look at Tra, his cousin Tra." The police identified "Tra" as Shaw. The police released Golston from custody on November 6, 2014, but continued to conduct surveillance on him. They followed Golston to a residence on East 70th Street in Kansas City. The police entered the home and located Shaw inside. The police arrested Shaw on November 6, 2014. Shaw was wearing the same shoes as those he wore on the date of Greene's murder, as evidenced by the gas station surveillance video.
Shaw denied any involvement in Greene's death. Shaw denied knowing Greene. The police showed Shaw phone records that reflected a call from his phone to Greene's phone. Shaw said that the number was not his and that someone else had used his name. Shaw explained that he had been robbed three weeks earlier, so he did not have a phone. Shaw was released from custody.
Police questioned Shaw again on May 22, 2015. Shaw initially denied knowing Greene, but when confronted with evidence that connected him with Greene, told the police he had no knowledge about Greene's homicide. Shaw first said that he received a ride to the gas station and walked back to his grandmother's house. When confronted with a screenshot from the gas station surveillance video showing him getting into the gold sedan, Shaw explained that the vehicle "turned left and they dropped him off at home before [Golston] and [Greene] were going to get some weed."
The officer conducting the interview told Shaw that a couple minutes after Shaw was seen in the gold sedan, Greene was dead. The officer told Shaw that the police knew he had been there at the scene. Shaw then told the police that "Golston was going to rob [Greene]" and that "he went along with it." Shaw said that Golston told him that there was going to be a robbery but that he did not know that *686 Golston was going to shoot Greene. Shaw claimed that Golston had used Shaw's phone and Facebook account to communicate with Greene. Shaw said that it was "stupid" to give Greene an address to meet that was next door to where he and Golston were staying. Shaw told the police that he was sitting in the front passenger seat of Greene's car and that Golston was seated in the back passenger seat. Shaw claimed that he exited Greene's vehicle once they arrived at 6901 Bellefontaine, and that a struggle over the gun then took place between Golston and Greene. Shaw told the police he left the scene after the shooting.
The State charged Shaw with murder in the second degree in violation of section 565.021, robbery in the first degree in violation of section 569.020, and two associated counts of armed criminal action in violation of section 571.015.[2] At trial, Shaw testified on his own behalf and provided yet another account of the events leading up to Greene's death. Shaw testified that when Greene initially contacted him via Facebook, he believed that Greene was trying to set him up. Shaw explained that he had been robbed three weeks earlier and that he was "a little paranoid or a little scared." Shaw testified that he told Greene, "Stop inboxing me. You ain't trying to get robbed tonight," in an effort to protect himself and not because he was planning to rob Greene. Shaw testified that, when the two later had a conversation about marijuana, he gave Greene Golston's phone number.
Shaw testified that he did not plan a robbery with Golston and did not know what Golston was trying to accomplish on the night of Greene's death. Shaw testified that he did not know that Golston and Greene had been communicating with each other on October 30, 2014. Shaw testified that he went with Golston and Greene that day to "get some marijuana" but that Greene did not have a "weed man" so the trio went in search of one. Shaw testified that after the three went to the gas station, they went to 6901 Bellefontaine to buy marijuana. Shaw testified that he stepped out of the vehicle to walk to the house, and as he was walking toward the house, he looked back, saw a struggle between Golston and Greene, and heard a gunshot. Shaw testified that he ran away at that point. Shaw explained that he previously told the police that he knew Golston planned to rob Greene because "that's what they wanted to hear."
The jury found Shaw guilty of the lesser included offense of felony stealing and recommended five years imprisonment; of the lesser included offense of involuntary manslaughter and recommended seven years imprisonment; and of two associated counts of armed criminal action and recommended seventeen years imprisonment for each count. The trial court entered a judgment of conviction and sentenced Shaw in accordance with the jury's recommendations, and ordered each sentence to run concurrently with the others.
Shaw appeals.
Analysis
Shaw asserts five points on appeal. In Points One and Two, Shaw asserts that the trial court erred in entering judgment convicting Shaw of felony stealing with an associated count of armed criminal action based on the application of State v. Bazell , 497 S.W.3d 263 (Mo. banc 2016), and its progeny. In Points Three and Four, Shaw challenges the sufficiency of the evidence to support his convictions of involuntary *687 manslaughter in the first degree with an associated count of armed criminal action. In Point Five, Shaw argues that the trial court committed plain error in submitting Instruction No. 26 to the jury, the verdict director for involuntary manslaughter.
Points One and Two: Shaw's Convictions of Felony Stealing and of an Associated Count of Armed Criminal Action
In his first point on appeal, Shaw asserts that the State's evidence was insufficient to support his conviction of felony stealing because, pursuant to Bazell and its progeny, the enhancement factors found in section 570.030.3 only apply to those offenses for which the value of services or property is an essential element of the crime. Shaw admits that the State presented sufficient evidence to support a conviction for misdemeanor stealing. Shaw asks us to vacate his felony conviction and sentence and to remand his case with instructions to enter a judgment of conviction for misdemeanor stealing with appropriate sentencing. In his second point on appeal, Shaw argues that, because he should not have been convicted of felony stealing, he could not have been convicted of the associated count of armed criminal action which requires the commission of a predicate felony pursuant to section 571.015.
The State concedes that pursuant to Bazell and its progeny,[3] Shaw could not have been convicted of felony stealing in this case and thus could not have been convicted of an associated count of armed criminal action.
Points One and Two on appeal are granted. Shaw's convictions of the class C felony of stealing pursuant to section 570.030.3(2) and of the associated count of armed criminal action pursuant to section 571.015.1 are vacated, as are the sentences imposed for both convictions. We remand this case to the trial court with directions to enter a judgment reflecting that Shaw is instead convicted of the class A misdemeanor of stealing pursuant to section 570.030.9, and for resentencing within the permissible range for a class A misdemeanor.
Points Three and Four: Shaw's Convictions of Involuntary Manslaughter in the First Degree Conviction and of an Associated Count of Armed Criminal Action
Shaw's third and fourth points on appeal claim error in overruling his motion for judgment of acquittal at the close of the evidence with respect to his convictions of involuntary manslaughter in the first degree and of an associated count of armed criminal action. In his third point, Shaw claims that there was insufficient evidence to demonstrate that Shaw acted in concert with Golston in committing involuntary manslaughter. In his fourth point, Shaw asserts that because he should not have been convicted of involuntary manslaughter, he could not have been convicted of the associated count of armed criminal action.
"Appellate review of sufficiency of the evidence is limited to whether the state has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt." State v. Hosier , 454 S.W.3d 883, 898 (Mo. banc 2015). In determining whether the evidence presented was sufficient to withstand a motion for judgment of acquittal and to support a conviction, we do not reweigh the evidence. State v. Naylor , 510 S.W.3d 855, 858-59 (Mo. banc 2017). In other words, we do not act as a " 'super juror' with veto powers." Id. at 859. Instead, we give great deference to the finder of fact, "accept[ing] as *688 true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignor[ing] all contrary evidence and inferences." Id. In addition, "[w]e defer to the jury's credibility determinations, recognizing the jury was entitled to believe 'all, some, or none' of the testimony of the witnesses." State v. Wade , 467 S.W.3d 850, 853 (Mo. App. W.D. 2015) (quoting State v. Crawford , 68 S.W.3d 406, 408 (Mo. banc 2002) ).
Shaw was found guilty of both involuntary manslaughter in the first degree and armed criminal action on a theory of accomplice liability. Under section 562.041.1(2), "[a] person is criminally responsible for the conduct of another when ... [e]ither before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." "The doctrine of accomplice liability embodied in section 562.041.1(2) 'comprehends any of a potentially wide variety of actions intended by an individual to assist another in criminal conduct.' " State v. Barnum , 14 S.W.3d 587, 591 (Mo. banc 2000) (quoting State v. Richardson , 923 S.W.2d 301, 317 (Mo. banc 1996) ). Any person "who in any way aids, abets, or encourages another in the commission of a crime by any form of affirmative participation with a common intent and purpose is guilty to the same extent as the principal offender even though the accomplice did not personally commit every element of the principal offense." State v. Kobel , 927 S.W.2d 455, 459 (Mo. App. W.D. 1996). If the defendant has affirmatively participated in a course of criminal conduct with others, he is responsible for those crimes which he could have reasonably anticipated would have been part of the course of conduct. State v. Ward , 473 S.W.3d 686, 694-95 (Mo. App. W.D. 2015).
Here, Shaw was alleged to have been Golston's accomplice. Shaw does not challenge that there was sufficient evidence to establish that Golston committed involuntary manslaughter in the first degree and armed criminal action. "A person commits the crime of involuntary manslaughter in the first degree if he ... [r]ecklessly causes the death of another person." Section 565.024.1. And "any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action...." Section 571.015.1.
Though Shaw does not contest the sufficiency of the evidence to establish that Golston committed the aforesaid offenses, Shaw challenges the sufficiency of the evidence to establish that he acted in concert with Golston to commit these offenses because there was no evidence connecting him with the gun used to kill Greene, and no evidence that he knew Golston had a gun or intended to shoot Greene. Shaw's argument misapprehends the law of accomplice liability.
Shaw admitted to police that he knew Golston intended to rob Greene. The evidence, viewed in the light most favorable to the jury's verdict, permitted the inference that Shaw was actively involved in setting up the meeting with Greene with the intent to forcibly rob Greene. Shaw has already admitted that the evidence was sufficient to support a conviction for stealing, albeit a misdemeanor. Having affirmatively participated in a course of criminal conduct with Golston to forcibly rob Greene, Shaw is responsible for those crimes which he could have reasonably anticipated would have been part of the course of conduct. Ward , 473 S.W.3d at 694-95. It is reasonable to anticipate that a joint criminal enterprise to forcibly rob *689 another may involve reckless conduct resulting in death and may involve the use of a dangerous instrument or deadly weapon.
Moreover, the jury could reasonably conclude that Shaw was lying about his lack of knowledge that Golston had a gun in an effort to distance himself from Golston's conduct. Shaw evidenced indicia of guilt in several ways, including through his late-October 2014 Facebook conversations with Martin, through his ever evolving accounts of the circumstances leading to Greene's death, and through his statement to police that he feared he would be locked up if he told the truth. The jury could also reasonably infer that Shaw was motivated to silence Greene, as Shaw reported to the police that he thought Golston was "stupid" for initially giving Greene an address to meet that was close to where Shaw and Golston had been staying.
In short, Shaw's argument requires us to assume that the jury believed he had no knowledge that Golston had a gun. However, even if the jury believed this "fact" to be true, Shaw's accomplice liability for involuntary manslaughter in the first degree and armed criminal action would not be negated. "The evidence need not establish a defendant's specific knowledge of which particular crime his co-participant will commit." State v. Whittemore , 276 S.W.3d 404, 407 (Mo. App. S.D. 2009). Shaw, as the accomplice, is "responsible for those crimes which he could reasonably anticipate would be part of the conduct." Id.
Moreover, Shaw's argument ignores our standard of review. We are required to view all evidence in the light most favorable to the verdict, including all reasonable inferences therefrom. Naylor , 510 S.W.3d at 859. The essential elements of involuntary manslaughter do not require proof that Golston caused Greene's death with a gun, rendering Shaw's knowledge that Golston had a gun irrelevant for the purpose of accomplice liability. While the essential elements of armed criminal action do require the use of a dangerous instrument or deadly weapon, our standard of review requires us to assume that the jury did not believe Shaw's claim that he was unaware that Golston had a gun, or that the jury concluded it was reasonable to believe that Shaw would have anticipated that Golston possessed a dangerous weapon at the time of the planned robbery.[4] Shaw argues that this is not a reasonable inference because the jury did not convict him of robbery in the first degree on a theory of accomplice liability, and instead convicted him of the lesser included offense of stealing. It is true that the differential essential elements between robbery in the first degree and the lesser included offense of stealing are that robbery in the first degree requires proof of the use of force and proof that, during the course of committing the crime either the defendant or another participant (1) caused serious physical injury to any person; (2) was armed with a deadly weapon; (3) used or threatened the immediate use of a dangerous instrument against any person; or (4)
*690 displayed or threatened to use what appears to be a deadly weapon or dangerous instrument.[5] Section 569.020. However, we do not assume that, by convicting Shaw of the lesser included offense of stealing, the jury "acquitted" Shaw of robbery in the first degree. See Tisius v. State , 183 S.W.3d 207, 217 (Mo. banc 2006) (observing that Missouri's instructions do not require the jury to acquit the defendant of a greater offense before considering the lesser offense). Thus, our standard of review and its application are not implicated by the fact that the jury convicted Shaw of the lesser included offense of felony stealing instead of convicting him of first degree robbery, while at the same time it convicted him of involuntary manslaughter in the first degree and armed criminal action on a theory of accomplice liability. " '[I]nconsistencies between verdicts on multiple counts in a criminal prosecution are not grounds for rejecting the individual verdicts; rather, the sufficiency of the evidence on each count is considered independently of the others.' " State v. McCauley , 528 S.W.3d 421, 428 (Mo. App. E.D. 2017) (quoting State v. Owens , 270 S.W.3d 533, 539-40 (Mo. App. W.D. 2008) ); see also State v. Clemons , 643 S.W.2d 803, 805-06 (Mo. banc 1983) ("An inconsistent verdict among several charges does not require a reversal provided there is sufficient evidence to support the jury's finding of guilt [on each count considered independently] ... Juries frequently convict on some counts and acquit on others not because they are unconvinced of guilt but simply because of compassion and compromise.") (quotation omitted).
There was sufficient evidence to support Golston's conviction for involuntary manslaughter in the first degree and the associated count of armed criminal action on a theory of accomplice liability.[6] Points Three and Four are denied.
Point Five: Instructing the Jury to Find Shaw Guilty if He "Acted Together with or Aided" Golston in Committing Involuntary Manslaughter in the First Degree
Shaw's fifth point on appeal argues that the trial court erred in giving the jury Instruction No. 26, the verdict director which instructed the jury to find Shaw guilty of involuntary manslaughter in the first degree if it found that Shaw "acted together with or aided Antonio Golston in committing the offense." Shaw asserts that instructing the jury in this disjunctive manner was inappropriate because there was no evidence presented at trial to demonstrate that he "acted together with" Golston to commit any of the conduct elements of involuntary manslaughter. Shaw asserts that, instead, the jury should have been instructed to find Shaw guilty if it found he "aided or encouraged" Golston. Shaw acknowledges that he did not object to Instruction No. 26 so that his point on appeal is not preserved *691 for appellate review.[7] Shaw requests plain error review.
"Instructional error seldom rises to the level of plain error." State v. Escobar , 523 S.W.3d 545, 548 (Mo. App. W.D. 2017). "Plain error review is used sparingly and is limited to those cases where there is a clear demonstration of manifest injustice or miscarriage of justice." State v. Kunonga , 490 S.W.3d 746, 755 (Mo. App. W.D. 2016). We review claims of plain error using a two-prong standard. Id. First, "we determine whether there is, indeed, plain error, which is error that is evident, obvious, and clear." Id. If plain error occurred, "then we look to the second prong of the analysis, which considers whether a manifest injustice or miscarriage of justice has, indeed occurred as a result of the error." Id. Manifest injustice or a miscarriage of justice occurs if "there is a reasonable probability that the jury's verdict would have been different, had the error not taken place." Id. "Appellate courts rarely find plain error in criminal cases if there is overwhelming evidence of guilt or the evidence is sufficient to support a conviction." Id. Shaw, as the appellant, bears the burden of establishing that plain error occurred and that it resulted in manifest injustice or a miscarriage of justice. Id.
Here, there is no error, plain or otherwise, in the submission of Instruction No. 26, which provided, in relevant part:
If you find and believe from the evidence beyond a reasonable doubt:
First, that on or about October 31, 2014, in the County of Jackson, State of Missouri, Antonio Golston caused the death of Dionte Greene by shooting him, and
Second, that Antonio Golston recklessly caused the death of Dionte Greene by shooting him,
then you are instructed that the offense of involuntary manslaughter in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:
Third, that with the purpose of promoting or furthering the commission of that involuntary manslaughter in the first degree, the defendant acted together with or aided Antonio Golston in committing the offense,
then you will find the defendant guilty ... of involuntary manslaughter in the first degree.
(Emphasis added.) Instruction No. 26 was patterned after MAI-CR 3d 304.04. Paragraph Third of MAI-CR 3d 304.04 anticipates the use of one of three phrases: "acted together with," "aided or encouraged," or "acted together with or aided." The latter of these options was used in this case. Relevant to Shaw's argument, the Notes on Use provide the following guidance in selecting the appropriate phrase:
Where the evidence shows the conduct elements of the offense were committed *692 entirely by someone other than the defendant and the sole basis for defendant's liability is his aiding the other person or persons (as where the defendant is not present but planned the offense, or where the defendant is the lookout or driver of the getaway car in a robbery or burglary), the defendant will usually be charged with the same offense and the same degree of the offense as the other person. In such cases,
(1) all of the elements of the offense, including the culpable mental state, should be ascribed to the other person or persons and not to the defendant, and
(2) select the alternative "aided or encouraged" in the paragraph following "then you are instructed that the offense of [name of offense ] has occurred...."
MAI-CR 3d 304.04, Notes on Use 5(a). Shaw claims that, because there was no evidence that Shaw committed any of the conduct elements of involuntary manslaughter, the Notes on Use to MAI-CR 3d 304.04 required the trial court to instruct the jury to find Shaw guilty if it found he "aided or encouraged" Golston, and not if it found that he "acted together with or aided" Golston.
We disagree. We have already explained that the evidence in this case supported the conclusion that Shaw was an active participant in the plan to forcibly steal from Greene, and the reasonable inference that Shaw knew or could reasonably have anticipated that Golston had a gun that could or would be used to execute the plan, with the risk of recklessly causing Greene's death. The evidence supported use of the phrase "acted together with or aided" in Paragraph Third of the verdict director, Instruction No. 26.
Shaw's reliance on State v. Puig , 37 S.W.3d 373 (Mo. App. S.D. 2001) to urge plain error resulting in manifest injustice is thus unpersuasive. In Puig , the defendant retrieved a scale out of his pickup truck when a drug dealer asked the defendant to do so because he needed it to weigh marijuana. Id. at 374. The defendant was found guilty of the sale of a controlled substance under a theory of accomplice liability. Id. at 374-75. The verdict directing instruction used the phrase "acted together with or aided." Id. at 376. The court concluded that there was no evidence to support that the defendant either transferred the marijuana or received consideration, and thus there was no evidence that the defendant committed any of the conduct elements of the offense. Id. at 377. The court concluded use of the phrase "acted together or aided" was prejudicially erroneous because of its disjunctive nature, as some jurors could have concluded that the defendant merely aided the dealer, while others believed delivery of the scale was enough to act together with the dealer to commit the charged crime. Id. at 378. Shaw's case is plainly distinguishable as the evidence supports the reasonable inference that Shaw both aided and acted together with Golston to forcibly steal from Greene using reckless means (a dangerous instrument or weapon), resulting in Greene's death.
In any event, the holding in Puig has been limited, if not discredited, by later decisions. In State v. Biggs , 170 S.W.3d 498, 504 (Mo. App. W.D. 2005), we characterized the Puig decision as "problematic." We explained:
The problem evinced by this assertion is that it complicates the underlying theory of accessory liability. A person is held accountable for a crime arising from both his own conduct and from the conduct of another for which he is criminally responsible. A person is criminally responsible for the conduct of another when he "aids or agrees to aid or attempts to aid such person in planning, committing or attempting to commit the offense." The central tenet of accomplice liability is the notion that all who act *693 together "with a common intent and purpose" in committing a crime are equally guilty. The legal effect is the same regardless whether an individual is a principal or an accomplice in the commission of a crime, and Missouri makes no distinction between principals and accessories. An accomplice is no less guilty than a principal. Because no distinction of guilt is recognized between principal and accomplice in the law, "the State [is] not required to charge [a] [d]efendant as an accomplice since charging a defendant as a principal or as an aider or encourager has the same legal effect and, even if charged as a principal, the case may be submitted to the jury on the theory of accomplice liability."
Id. (quoting State v. Shockley , 98 S.W.3d 885, 890 (Mo. App. S.D. 2003) ) (other citations omitted). Thus, whether the defendant committed "all, some, or none of the conduct elements is irrelevant." Id. at 505. Instead, the relevant question is whether the defendant aided or acted together with the defendant in the commission of the crime. Id. The court found that, because the evidence presented showed that the defendant "associated himself with the venture for which he was charged and that he participated in the crime by providing essential conduct for its successful completion," "the trial court did not commit plain error in giving the instruction approved by defendant through counsel at the instruction conference and never objected to during the trial." Id.
In State v. Young , 369 S.W.3d 52 (Mo. App. E.D. 2012), the Eastern District considered the prejudicial effect in instructing the jury that the defendant "acted together with or aided" when evidence only supported that the defendant "aided" the principal. The court noted that "an ordinary juror would have no understanding of the legal principles underlying conduct elements or intent elements of a crime." Id. at 58. The court explained:
The two terms-"acted together with" and "aided"-were not defined for the jury. In considering the facts of this case, an ordinary juror would see no distinction between the two terms and would treat them as functionally equivalent. In ordinary language, when we think of "aiding" someone, we likely think of "acting together with" him or her. Likewise, when we think of "acting together with" someone, we likely think of "aiding" that person.
Id. The evidence and reasonable inferences in Young established that the defendant targeted and approached the victim, shoved his way into the apartment, signaled for another man to enter the apartment, held the victim at gunpoint while another man bound the victim, gagged the victim and placed a bag over the victim's head, ransacked the victim's apartment, and then confirmed that the other man had shot the victim. Id. The court held:
Under [those] circumstances, a reasonable juror applying the phrase's ordinary meaning would consider the defendant's affirmative participation with the other man in committing the crime, and would conclude that the defendant "acted together with" the other man to assault the victim. Likewise, a reasonable juror applying the word's ordinary meaning would conclude that the defendant "aided" the other man's assault on the victim. Given the facts of this case, we have no reason to believe that the jurors drew such a fine legal distinction between the terms "acted together with" and "aided" as contemplated in Puig . And without such a fine legal distinction, the defendant's claim of prejudice cannot be demonstrated.
Id.
The submission of Instruction No. 26 was not erroneous, plainly or otherwise. Point Five is denied.
*694 Conclusion
We vacate the judgment insofar as it entered convictions and sentences for felony stealing with an associated count of armed criminal action. We remand this matter for the entry of a judgment convicting Shaw of the class A misdemeanor of stealing and for resentencing in the appropriate range. In all other respects, the trial court's judgment is affirmed.
All concur

"On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." State v. Rice , 504 S.W.3d 198, 200 n.3 (Mo. App. W.D. 2016).

Unless otherwise noted, all statutory references are to the version in effect the date the crimes were committed, October 31, 2014.

See State v. Smith , 522 S.W.3d 221 (Mo. banc 2017).

Shaw argues in his brief that the State acknowledged in its closing argument that he was unaware that Golston had a gun when it argued that: "And the only, one of the only, possibly true statements he gave to [the police] was, 'I didn't know he was going to shoot him.' " Arguments made by the State during closing argument do not affect the sufficiency of the evidence. See State v. Johnson , 316 S.W.3d 491, 498 (Mo. App. W.D. 2010) ("The relevant question is not what arguments the prosecutor made; rather, the relevant question is what evidence could the jury have credited and what reasonable inferences could the jury have drawn from that evidence. The question of sufficiency arises before the case is put to the jury and is really an issue of whether the case should have been submitted to the jury.").

Robbery in the second degree, which was another lesser included offense submitted to the jury, occurs when a person "forcibly steals property." See section 569.030.1.

In addition to arguing that there was insufficient evidence demonstrating Shaw's knowledge as to Golston's possession of the firearm, Shaw also argues on appeal that because the jury found Shaw not guilty of murder in the second degree as a result of perpetration of stealing, the jury necessarily concluded that Greene's death was not a result of the stealing but instead a separate act. We reject Shaw's suggestion that the jury's verdict as to murder in the second degree as a result of the perpetration of stealing affects our analysis as to the sufficiency of the evidence to support Shaw's conviction for involuntary manslaughter in the first degree. See State v. Zetina-Torres , 482 S.W.3d 801, 809 (Mo. banc 2016) (" '[A] reviewing court's limited determination on sufficiency review ... does not rest on how the jury was instructed.' " (quoting Musacchio v. United States , --- U.S. ----, 136 S.Ct. 709, 715, 193 L.Ed.2d 639 (2016) )).

Defense counsel requested that the trial court instruct the jury as to the lesser included offense of involuntary manslaughter "with accomplice liability." The State argues on appeal that, by requesting the allegedly erroneous instruction and arguing that the instruction should include language regarding accomplice liability, Shaw invited the error about which he now complains, preventing even plain error review. It is true that in State v. Bolden , our Supreme Court held that "the proffering of an incorrect instruction to the trial court is an invited error by the party who proffered the instruction" and refused to rely on plain error review "to impose a sua sponte duty on the trial court to correct ... invited errors." 371 S.W.3d 802, 806 (Mo. banc 2012). However, in this case, while Shaw requested that the trial court instruct the jury as to involuntary manslaughter with accomplice liability, the record does not indicate that Shaw proffered Instruction No. 26 in the form submitted to the jury. The record supports the conclusion that the trial court prepared the instructions.