IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
IN THE INTEREST OF J.A.T., )
 Appellant, )
 )
v. ) WD83968
 )
JACKSON COUNTY JUVENILE ) FILED: July 20, 2021
OFFICE, )
 Respondent. )
 Appeal from the Circuit Court of Jackson County
 The Honorable Jalilah Otto, Judge
 Before Division Two: Mark D. Pfeiffer, P.J.,
 and Alok Ahuja and Karen King Mitchell, JJ.
 J.A.T. is a juvenile. The Circuit Court of Jackson County entered a judgment

finding that he committed acts which would constitute the felonies of first-degree

assault and armed criminal action if he were an adult. The court committed J.A.T.

to the custody of the Division of Youth Services.

 Due to the risk of disease transmission associated with the COVID-19

pandemic, the circuit court refused to transport J.A.T. from the detention facility

where he was in custody to the court for his adjudication hearing, and J.A.T.

accordingly participated in the hearing by videoconference (although all other trial

participants were physically present in the courtroom).

 J.A.T. appeals. He argues that the evidence was insufficient to find that he

committed acts constituting first-degree assault and armed criminal action,

personally or as an accomplice. He also argues that the circuit court denied his
constitutional rights to due process and to confront adverse witnesses when it

required him to participate in the adjudication hearing by videoconference.

 We reject J.A.T.’s sufficiency-of-the-evidence claim. Based on the reasoning

of our recent opinion in In re C.A.R.A., No. WD83967 (July 6, 2021), we conclude

that J.A.T.’s right to confront adverse witnesses was violated when the court

refused to permit him to appear at his adjudication hearing in person, without any

specific finding that his exclusion from the hearing was necessary or justified by

exceptional circumstances. Based on this conclusion, we would normally reverse

the circuit court’s judgment and remand for further proceedings. Like in C.A.R.A.,

however, we instead order that the case be transferred to the Missouri Supreme

Court for final disposition pursuant to Rule 83.02, given the general interest and

importance of the Confrontation Clause issues which J.A.T. raises.

 Factual Background
 On January 17, 2020, the Juvenile Officer filed a petition in the Circuit Court

of Jackson County, alleging that fourteen-year-old J.A.T. had committed acts which

would constitute the felonies of assault in the first degree and armed criminal

action if he were an adult. The Juvenile Officer alleged that, on or about January 7,

2020, J.A.T. knowingly caused serious physical injury to Dalvon Stiner by shooting

Stiner multiple times. The Juvenile Officer alleged that J.A.T. committed the

offenses personally, or with an accomplice for whom J.A.T. would be criminally

responsible if tried as an adult.

 Prior to his adjudication hearing, J.A.T. filed a written objection to being

required to participate in the hearing solely by means of videoconferencing

technology, and not being permitted to attend the hearing in person. J.A.T. argued

that denying him the right to personally attend the hearing would violate his rights

under the United States and Missouri Constitutions, and under Missouri statutes
and Supreme Court rules. The Juvenile Officer filed a response, arguing that

 2
restricting J.A.T. to participation by videoconference was legally justified and

appropriate in light of the ongoing COVID-19 pandemic.

 The adjudication hearing was held on July 7, 2020. The circuit judge, J.A.T.’s

attorney, the attorney for the Juvenile Officer, a Deputy Juvenile Officer, a Victim

Services representative, J.A.T.’s parents, and both of the fact witnesses appeared at

the adjudication hearing in person. Only J.A.T. appeared by videoconference.

 At the outset of the hearing, J.A.T. renewed his objection that he should be

permitted to attend the hearing in person. The court denied J.A.T.’s request to be

physically present. Addressing J.A.T.’s counsel, the court explained:

 I think I've said this before or not in this case, but I have in other
 cases. In the times of the pandemic, of the coronavirus and COVID-19,
 we've had to make a number of significant adjustments to how we do
 things in court.
 One of them is utilizing the Webex [two-way videoconferencing]
 technology, which the Supreme Court has explicitly given us
 permission to do so. That coupled with the fact that there have been
 numerous detention facilities who have had difficulty . . . keeping
 COVID-19 out of their facilities. Our facility has done a great job of
 doing that. We want to keep doing that.
 One of the policies being put in place by the detention center of
 the Family Court is that the juveniles will not be transported to and
 from court to limit the exposure to germs of that particular juvenile as
 well as additional juveniles in detention. The Court believes that's
 reasonable for them to make such a policy. It's reasonable for the
 Court to follow it.
 Furthermore, following the Webex procedure as outlined by the
 Supreme Court, I don't believe, violates his due process rights in any
 way. For that reason, I will deny your request to have him here in
 person.
An intern for J.A.T.’s attorney was present in the detention facility with J.A.T.

throughout the hearing. Moreover, J.A.T.’s attorney relocated to the detention

center to be with J.A.T. during a recess in the adjudication hearing; counsel

presented his closing argument to the court from the detention center, in J.A.T.’s
physical presence.

 3
 At the adjudication hearing, the victim Dalvon Stiner testified that at the

time of the incident he was living in his car and selling marijuana to support

himself. On January 7, 2020, Stiner was contacted on Snapchat by an individual

with the username RHNJonas, who requested to purchase marijuana from Stiner.

Stiner agreed to meet RHNJonas at an apartment complex in Grandview.

 It was dark when Stiner arrived at the agreed location. Stiner remained in

his vehicle. Two people approached him with money for the drug purchase, $60

each. Stiner was not expecting two people, and became suspicious that they might

try to rob him. After the two individuals gave Stiner their money, however, he let

them into his car, with one individual sitting in the front passenger seat and the

other in the back. Stiner testified the individual in the front seat was a light-

skinned African-American male, wearing dark clothing, and with a “little bit long

hair,” an “afro.”

 The purchasers asked Stiner to divide the marijuana into two separate bags

for them. As Stiner began to divide the marijuana, he recalled “just being, like

rushed. Like, somebody reached up trying to grab stuff. And then I just remember

hearing the shots and blacking out.” Stiner testified that it appeared that the front-

seat passenger was trying to grab the bags of marijuana that were in the console
between the front seats. Stiner responded by trying to pull the bags back, when he

was shot and blacked out. Stiner was shot six times. When Stiner woke up, there

was “blood everywhere.” He first called a friend, and then the police. Stiner was

taken to the hospital, where he required surgery.

 Stiner testified he did not see who shot him, nor did he see either person with

a gun. Although Stiner was armed that night, and had his gun nearby at the time

of the assault, he did not shoot or even pull out his weapon, as “[e]verything

happened so fast”; he “never had a chance” to pull out his gun. Stiner stated that
the suspects did not take his marijuana, money, gun, or other belongings.

 4
 When Grandview Police Detective Kaitlyn Elias searched Stiner’s vehicle, she

found five .45 caliber shell casings, two .40 caliber shell casings, marijuana located

in two different locations (totaling 18 grams), a bullet fragment, and a Glock 26 9-

millimeter firearm. The Glock 26 was the firearm Stiner possessed at the time of

the incident; it had been reported stolen in Kansas City. A .45-caliber magazine

was also located in Stiner’s vehicle.

 The day after the incident, Stiner spoke to Detective Elias and another

Grandview Police Detective. While he could not remember exactly what he told

them, Stiner testified that he told the officers that he had gotten shot, and gave

them the Snapchat username of the person who had contacted him to arrange the

drug purchase.

 Detective Elias testified that Stiner described the two suspects as fourteen-

to-sixteen years old, about 5’5” or 5’6” in height. Detective Elias testified that

Stiner provided her with two usernames associated with the Snapchat account with

which he had communicated: ImaGod4 and RHNJonas. Stiner also indicated that

he had seen the back-seat passenger with a firearm, and that he had engaged in a

struggle with the back-seat passenger trying to keep the gun away. Detective Elias

testified that Stiner told her that, as he pushed the back-seat passenger’s gun out of
his face, the front-seat passenger reached for Stiner’s gun. Stiner told the

Detectives that he hit the front-seat passenger multiple times. Stiner also stated

that it was the back-seat passenger who had shot him.

 The Detectives learned J.A.T.’s name and address from the Grandview School

District. J.A.T.’s home was in close proximity to the scene of the assault.

 Detective Elias obtained a photograph of J.A.T., which she placed in a photo

line-up. Stiner identified J.A.T. from the line-up as the individual that had been

sitting in the front seat of his car. Stiner also identified another individual as the
back-seat passenger.

 5
 Detective Elias procured a search warrant to obtain information from

Snapchat regarding the ImaGod4/RHNJonas account. In response, Detective Elias

received videos of J.A.T. associated with the account. Detective Elias testified that

one of the videos, which was shot “just prior” to Stiner’s call to the police on January

7, 2020, showed J.A.T. holding a handgun. Detective Elias testified that J.A.T.

waved the gun in front of the camera. At one point, this allowed a viewer to look

down the gun’s barrel and see the “distinct X mark ammunition . . . loaded in the

chamber.”

 Although DNA was recovered from multiple locations within Stiner’s vehicle,

none matched J.A.T. A search warrant was executed at J.A.T.’s home, but no

firearms were located.

 J.A.T. moved for a judgment of acquittal at the close of the Juvenile Officer’s

evidence and at the close of all evidence, arguing that insufficient evidence had been

presented to prove beyond a reasonable doubt that he had committed the alleged

offense or possessed the requisite mental state. The court denied J.A.T.’s motions.

It found that the Juvenile Officer had proven both first-degree assault and the

associated offense of armed criminal action beyond a reasonable doubt. After a

disposition hearing, the court committed J.A.T. to the custody of the Division of
Youth Services.

 J.A.T. appeals.

 Discussion
 I.
 In his first Point, J.A.T. argues that the evidence was insufficient to show

that he personally committed acts constituting first-degree assault by shooting

Stiner, or to show that he aided or attempted to aid his accomplice in committing

the assault. J.A.T. therefore argues that the adjudications of first-degree assault
and armed criminal action must both be reversed.

 6
 We conclude in § II below that J.A.T. is entitled to a new adjudicatory

hearing because the circuit court violated his right to confront the adverse

witnesses. As we explained in C.A.R.A., slip op. at 4-5, J.A.T.’s sufficiency-of-the-

evidence claim would entitle him to dismissal of the Juvenile Officer’s allegations,

not merely a new trial. Because J.A.T.’s sufficiency-of-the-evidence claim would

entitle him to broader relief, we separately address it, despite our disposition of

Point II.

 Juvenile proceedings are reviewed in the same manner as other court-
 tried cases. This Court will affirm a judgment in a juvenile proceeding
 unless it is not supported by evidence, is against the weight of
 evidence, or erroneously declares or applies the law. The credibility of
 the witnesses and the weight their testimony should be given is a
 matter to be determined at the hearing by the circuit court, which is
 free to believe none, part, or all of their testimony.
 For a sufficiency of the evidence challenge, the evidence,
 including all reasonable inferences therefrom, is considered in the light
 most favorable to the judgment . . . .
D.C.M. v. Pemiscot Cnty. Juv. Off., 578 S.W.3d 776, 786 (Mo. 2019) (citations and

internal quotation marks omitted). While we view the evidence and all reasonable

inferences from the evidence in the light most favorable to the circuit court’s

findings, we may “not supply missing evidence, or give the [Juvenile Officer] the

benefit of unreasonable, speculative or forced inferences.” State v. Whalen, 49
S.W.3d 181, 184 (Mo. 2001), modified on other grounds by State v. Claycomb, 470

S.W.3d 358, 362 n.5 (Mo. 2015).

 “When a juvenile is alleged to have committed an act that would be a

criminal offense if committed by an adult, the standard of proof, like that in

criminal trials, is beyond a reasonable doubt.” D.C.M., 578 S.W.3d at 786 (citation

omitted).

 7
 A person commits the offense of assault in the first degree if he knowingly

causes or attempts to cause serious physical injury to another person. § 565.050.1

If a person commits such a felony “by, with, or through the use, assistance, or aid of

a dangerous instrument or deadly weapon,” he is also guilty of the offense of armed

criminal action. § 571.015.

 It was not necessary for the Juvenile Officer to prove that J.A.T. himself shot

Stiner. “A person is criminally responsible for the conduct of another when: . . .

Either before or during the commission of an offense with the purpose of promoting

the commission of an offense, he . . . aids or agrees to aid or attempts to aid such

other person in planning, committing or attempting to commit the offense.”

§ 562.041.1(2). “Pursuant to the concept of accomplice liability, all persons who act

in concert to commit an offense are equally responsible for the act. In addition, a

person who embarks upon a course of criminal conduct with others is responsible for

those offenses which he could reasonably anticipate would be part of that conduct.”

In re S.B.A., 530 S.W.3d 615, 624 (Mo. App. E.D. 2017) (citations and internal

quotation marks omitted). “The evidence need not establish a defendant's specific

knowledge of which particular crime his co-participant will commit.” State v.

Whittemore, 276 S.W.3d 404, 407 (Mo. App. S.D. 2009).
 “Proof of any form of participation by defendant in the crime is enough to

support a conviction.” State v. Townsend, 810 S.W.2d 726, 727 (Mo. E.D. App.

1991). The Juvenile Officer must show that the accused “associated himself with

the crime in some fashion and took some affirmative action.” State v. Harris, 602

S.W.2d 840, 844-85 (Mo. App. W.D. 1980); M.A.A. v. Juv. Officer, 271 S.W.3d 625,

629 (Mo. App. W.D. 2008) (citation omitted).

 1 Statutory citations refer to the 2016 edition of the Revised Statutes of
Missouri, updated by the 2019 Cumulative Supplement.

 8
 The accused’s “presence at the scene of the crime, flight therefrom and

association with others involved before, during and after commission of the crime

are indicia of aiding and abetting.” State v. Neal, 14 S.W.3d 236, 240 (Mo. App.

W.D. 2000). “However, none of these factors alone is enough to sustain a

conviction.” Townsend, 810 S.W.2d at 727. Therefore, “[w]e must determine

whether all the facts and circumstances in evidence considered together raise a

reasonable inference that defendant participated in the offense charged.” M.A.A.,

271 S.W.3d at 629.

 The evidence may not have been sufficient to prove that J.A.T. himself shot

Stiner. There was sufficient evidence from which the court could find that J.A.T.

was responsible as an accomplice, however, because he acted with the purpose of

promoting the commission of first-degree assault and armed criminal action by

engaging in a “course of criminal conduct” with his accomplice, from which J.A.T.

could reasonably anticipate the assault. The evidence indicated that J.A.T.

arranged the drug transaction with Stiner over Snapchat. During their

communications J.A.T. failed to mention that he would be arriving with another

person, and would want the marijuana divided into two separate quantities. A level

of coordination between J.A.T. and the shooter was apparent as they approached
Stiner’s vehicle together, both with half of the needed cash in hand, and then, upon

entering the vehicle, asked for the marijuana to be split into separate bags. It is a

reasonable inference that the request to divide the marijuana was intended to

distract Stiner, and occupy his hands, to make a theft easier.

 J.A.T.’s actions inside Stiner’s vehicle confirm that he was acting jointly with

his accomplice to forcibly steal from Stiner. J.A.T.’s attempt to grab Stiner’s

marijuana shows his intent to steal it. Moreover, the evidence demonstrates that

Stiner and J.A.T. struggled, and that J.A.T. attempted to grab Stiner’s gun, as
J.A.T.’s accomplice was pointing his own gun at Stiner. The course of events

 9
indicates a level of coordination and common purpose between J.A.T. and his

accomplice, and a joint intent to steal the marijuana forcibly from Stiner. Even if

J.A.T. had planned only to forcibly rob Stiner, but had not intended that Stiner

would be shot, “[i]t is reasonable to anticipate that a joint criminal enterprise to

forcibly rob another may involve reckless conduct resulting in death [or serious

physical injury] and may involve the use of a dangerous instrument or deadly

weapon.” State v. Shaw, 541 S.W.3d 681, 688–89 (Mo. App. W.D. 2017). “The

evidence need not establish a defendant's specific knowledge of which particular

crime his co-participant will commit. . . . [An] accomplice[ ] is ‘responsible for those

crimes which he could reasonably anticipate would be part of the conduct.’” Id.

(citation omitted).2

 J.A.T. argues that reversal is required by State v. Neal, 14 S.W.3d 236 (Mo.

App. W.D. 2000). In that case, the defendant Neal instigated a fight with the victim

in the pool room of a large bowling alley. Id. at 237. As Neal and the victim fought,

Neal’s friend hit the victim over the head with a pool cue. Id. at 238. Neal was

convicted of first-degree assault as an accomplice. Id. He argued on appeal that

there was insufficient evidence that he aided or encouraged his friend to hit the

victim with the pool cue. Id. We agreed and reversed Neal’s conviction. We found
that “there was no common intent to commit any crime . . . or any actions from

which such an intent can be inferred.” Id. at 241. “[T]he State offered no evidence

that Mr. Neal [and his friends] intended to commit any crime together prior to the

 2 Some of the evidence described in the text comes from the testimony of
Detective Elias, recounting what Stiner told her and another Detective shortly after the
shooting. It is possible that some or all of Detective Elias’ testimony concerning what
Stiner said was inadmissible hearsay. But J.A.T. did not object to Detective Elias’
testimony, and “it [is] well-established law in Missouri that hearsay admitted without
objection may properly be considered as evidence by the trier of fact.” State v. Goodwin, 43
S.W.3d 805, 818 (Mo. 2001) (citation omitted); accord State v. Crawford, 68 S.W.3d 406, 408
(Mo. 2002).

 10
criminal act charged.” Id. Instead, the evidence showed that “Neal acted

independently in instigating the fight and that [his friend] joined the fracas of her

own volition.” Id. “Neal did not encourage her participation, nor is there evidence

that he intended for [his friend] to join him in the fight.” Id.

 This case is distinguishable from Neal. Unlike in Neal, the evidence in this

case permitted the circuit court to find that J.A.T. and his accomplice specifically

set out to commit a crime together – forcibly stealing from a drug dealer. The

evidence indicates that J.A.T. and his accomplice did not act “independently,” but

instead acted in a coordinated fashion to achieve a common objective. The evidence

was sufficient to establish J.A.T.’s responsibility for the actions of his accomplice,

which met the definitions of first-degree assault and armed criminal action.

 Point I is denied.

 II.
 In his second Point, J.A.T. asserts that his right to confront the witnesses

against him was violated when the circuit court required him to participate in the

adjudication hearing by two-way videoconferencing. Based on our analysis in In re

C.A.R.A., No. WD83967 (Mo. App. W.D. July 6, 2021), we agree that J.A.T.’s rights

under the Confrontation Clause were violated.3

 Our opinion in C.A.R.A. identifies the legal principles which govern J.A.T.’s

Confrontation Clause arguments.4 As we explained in C.A.R.A., the same

 3 In addition to arguing that his right to confront adverse witnesses was
violated, J.A.T. argues that he was also denied his separate right to be physically present at
the adjudication hearing. He contends that his right to be present stems from the federal
and Missouri Constitutions, see, e.g., Kentucky v. Stincer, 482 U.S. 730, 745 (1987), and In
re S.H., 75 S.W.3d 286, 288-89 (Mo. App. E.D. 2002), and from Supreme Court Rule
128.01(a). Given our conclusion that J.A.T.’s right to confront adverse witnesses was
violated, we need not separately decide whether J.A.T. would be entitled to a new trial
because the circuit court violated his right to be present at the adjudication hearing.
 4 We recognize that this case differs from C.A.R.A., because in this case the
witnesses against J.A.T. appeared in person in the courtroom; it was J.A.T. who was
required to participate in the proceeding by videoconference. Neither J.A.T. nor the

 11
Confrontation Clause principles apply to juvenile delinquency proceedings as to

adult criminal proceedings. C.A.R.A., slip op. at 10-11. In determining whether

witnesses may testify by two-way videoconferencing despite a defendant’s assertion

of his Confrontation Clause rights, courts have applied two legal standards. Id. at

11-13. Under the first, “a defendant's right to confront accusatory witnesses may be

satisfied absent a physical, face-to-face confrontation at trial [(1)] only where denial

of such confrontation is necessary to further an important public policy and [(2)]

only where the reliability of the testimony is otherwise assured.” Maryland v.

Craig, 497 U.S. 836, 850 (1990). Under the second standard, testimony by two-way

videoconferencing may be permissible where “exceptional circumstances” exist, and

where the witnesses are otherwise “unavailable.” United States v. Gigante, 166

F.3d 75, 81 (2d Cir. 1999).

 As in C.A.R.A., we need not decide in this case which of the two competing

standards is the proper test for Confrontation Clause challenges to the use of

videoconferencing technology in juvenile delinquency proceedings. Whichever

standard applies, the circuit court failed to meet it. The court failed to make

findings either that denial of confrontation was “necessary to further an important

public policy,” Craig, 497 U.S. at 850, or that “exceptional circumstances” existed,
and that the Juvenile Officer’s witnesses were “unavailable” to testify due to

“physical or mental illness or infirmity” (or were “unavailable” for any other

reason). Gigante, 166 F.3d at 81 (citations omitted). As we explained in C.A.R.A.,

both the Craig and Gigante standards are intended to erect a high bar, and to

permit remote testimony only in rare instances, based on specific findings that such

Juvenile Officer argues that a different Confrontation Clause analysis should apply because
J.A.T., rather than the adverse witnesses, was absent from the courtroom. Whatever the
location of the various trial participants, the critical fact is that J.A.T. was denied the right
to be physically co-located with the adverse witnesses as they gave testimony against him.

 12
remote testimony is required in order to address particular health and safety

concerns. C.A.R.A., slip op. at 14-16.

 When it overruled J.A.T.’s objection to participating by videoconference, the

circuit court noted that the detention facility where J.A.T. was housed had

instituted a policy of not transporting detainees to court proceedings, “to limit the

exposure to germs of that particular juvenile as well as additional juveniles in

detention.” The court stated its view that it was “reasonable for [the detention

facility] to make such a policy,” and that “[i]t's reasonable for the Court to follow it.”

Thus, the circuit court made no finding of necessity, or of exceptional circumstances,

whatsoever. Instead, it merely found that it was “reasonable” for the detention

facility to have instituted a policy barring detainees from attending court

proceedings, and that it was “reasonable” for the court to defer to the detention

facility’s policy choice.

 We recognize that, because J.A.T. was housed in a juvenile detention facility,

the court may have had a special obligation to keep him, and other residents of that

detention facility, healthy and safe. Nevertheless, besides the lack of sufficient

findings, there is no evidence in the record concerning the particular circumstances

of the detention facility, of J.A.T., or of the prosecution’s witnesses, which required
that J.A.T. and the adverse witnesses be kept physically separated from one

another. No evidence was presented to the circuit court concerning any particular

risks to residents at the detention facility where J.A.T. was being held, or

concerning the efficacy of protective measures which could be taken at the detention

facility, during J.A.T.’s transport, or in the courtroom, to minimize the risks of

coronavirus transmission. The purported “necessity” of excluding J.A.T. from the

courtroom is also undermined by the fact that the court permitted all other trial

participants to be physically present in the courtroom during J.A.T.’s adjudication
hearing. Moreover, despite the “no-transport” policy apparently adopted by the

 13
detention facility, an intern was allowed to remain with J.A.T. in the detention

center throughout the hearing, and J.A.T.’s counsel was permitted to travel from

the courtroom to the detention facility, to deliver his closing argument from the

facility, alongside J.A.T. The purported necessity of isolating the detention facility’s

residents from court-hearing-related exposures is belied by the fact that J.A.T.’s

attorney was permitted to enter the facility and interact with J.A.T., after

experiencing just the sort of exposures which the facility was purportedly seeking to

eliminate.

 As we recognized in C.A.R.A., “in the context of an outbreak of an infectious

disease affecting the entire community, the Craig or Gigante standards might be

satisfied by generally applicable circumstances beyond the particulars of an

individual case.” C.A.R.A., slip op. at 16. But as in C.A.R.A., in this case “the

record contains no evidence, or findings, concerning the prevalence or risks of

COVID-19 in Jackson County or in Kansas City, or in the circuit court’s own

facilities, at the relevant time; concerning any community-wide resource or

logistical constraints; or concerning any community-wide restrictions which had

been put in place by health authorities.” Id.

 For reasons more fully explained in our opinion in C.A.R.A., we conclude that
J.A.T.’s Confrontation Clause rights were violated by his exclusion from the

adjudication hearing. Such a violation does not require a new trial, however, if the

State can demonstrate that the violation of J.A.T.’s right was “harmless beyond a

reasonable doubt under the standard of Chapman v. California, 386 U.S. 18, 24

(1967).” Coy v. Iowa, 487 U.S. 1012, 1021 (1988). “An assessment of harmlessness

cannot include consideration of whether the witness' testimony would have been

unchanged, or the [fact-finder’s] assessment unaltered, had there been

confrontation; such an inquiry would obviously involve pure speculation, and
harmlessness must therefore be determined on the basis of the remaining evidence”

 14
untainted by the Confrontation Clause violation. Id. at 1021-22; accord State v.

Hill, 247 S.W.3d 34, 42 (Mo. App. E.D. 2008) (“[w]e evaluate harmlessness by

reviewing the remaining evidence” separate from the testimony affected by

Confrontation Clause violation). In this case, there is no “remaining evidence”

which was not affected by the denial of J.A.T.’s right to confrontation, and we

therefore cannot find the violation to be harmless.

 Accordingly, we would normally reverse the circuit court’s judgment

sustaining the allegations of first-degree assault and armed criminal action, and

remand for further proceedings consistent with our opinion. As explained more

fully in C.A.R.A., however (see slip op. at 20-21), the Confrontation Clause questions

presented by these cases are issues of “general interest or importance” within the

meaning of Rule 83.02, and – like C.A.R.A. – we accordingly transfer the case to the

Missouri Supreme Court for final disposition.

 Conclusion
 Pursuant to Rule 83.02, we order that this case be transferred to the Missouri

Supreme Court for final disposition.

 Alok Ahuja, Judge
All concur.

 15