**STATE of Missouri,**
**Plaintiff/Respondent,**

v.

**Dwayne MILLER, Defendant/Appellant.**

No. ED 83858.

Missouri Court of Appeals,
Eastern District,
Division One.

Jan. 11, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 30, 2005.

Application for Transfer Denied May 31, 2005.

Deborah B. Wafer, St. Louis, MO, for appellant.

Deborah Daniels, Daniel Neal McPherson—Co–Counsel, Jefferson City, MO, for respondent.

SHERRI B. SULLIVAN, J.

### Introduction

Dwayne Miller (Defendant) appeals from a judgment of conviction of first-degree murder, armed criminal action, and first-degree attempted robbery. Defendant alleges trial court error in sustaining the State's challenge to Defendant's peremptory strike of a white venireperson, overruling Defendant's challenge to the State's peremptory strikes of two black venirepersons, and in sustaining the State's objection to defense counsel's attempt to compare for the venire the difference between the civil and criminal burdens of proof. We affirm.

### Factual and Procedural Background

Defendant does not challenge the sufficiency of the evidence to support his convictions. Viewed in the light most favorable to the verdict, the evidence adduced at trial reveals the following. Lisa Thomas (Thomas) was walking with her daughter to a restaurant near her house. On her way, Thomas saw Paul Henley (Henley), an acquaintance with whom Thomas had been doing errands earlier in the day, and Defendant in a vacant lot next to her house. Thomas overheard part of a conversation between the two men in which they made reference to black tar heroin and her brother, Cornelius Dukes (Dukes), a drug dealer. Testifying under a plea agreement, Henley corroborated those observations, testifying that he met Defendant on a vacant lot, where they discussed robbing Dukes. Earlier in the day, Thomas had bought a box of sandwich bags for Dukes to use to package some black tar heroin and brought the box to Dukes's house. Henley was with Thomas when she did this errand, but he remained in the car.

Later that evening, Defendant and Henley went to Dukes's house. They followed Renee Spann (Spann), Dukes's girlfriend's mother, who also lived in the house, into the house when she returned home. Both men were brandishing guns when they entered the house. Defendant held a semiautomatic pistol and Henley held a .38 caliber revolver.

Defendant demanded money and/or drugs from Dukes. Dukes walked into the bedroom, retrieved a small amount of crack cocaine, and gave it to Defendant. Defendant demanded more drugs, and he and Dukes began scuffling. Tracy Alston (Alston), Dukes's girlfriend, who also lived in the house, grabbed their two children and fled towards the back door of the house, along with Spann.

Defendant's gun was pointed towards Dukes's abdomen, and Spann heard a gunshot as she saw the two men struggling. Henley fired a shot, hitting Dukes in the leg. Defendant and Dukes continued wrestling, and Henley fled from the house. As Alston reached the back door, she heard three gun shots, and Henley also

heard three gun shots as he fled from the house.

After a few moments, Alston returned to the house and saw Dukes staggering outside into the front yard. Dukes was taken to a hospital, where he was pronounced dead. Dukes had been shot five times: once in the back, with the bullet entering the abdomen; once in the back of the shoulder; and three times in the thigh. The cause of death was determined to be a gunshot wound to the abdomen. Police recovered three shell casings from a nine-millimeter semiautomatic pistol and one projectile of indeterminate type from the scene.

Later, detectives interviewed Spann and Alston and showed them a photo array, from which both women identified Defendant. After his arrest, Henley also identified Defendant from a photo array as the man who shot Dukes. Alston had no doubt that Defendant was the man who entered her house with a pistol and got into a wrestling match with Dukes. Alston had seen Defendant at her house a few months before the shooting, engaged in a conversation with Dukes, during which Dukes did not seem fond of Defendant. The police also interviewed Thomas, and she told them that she overheard a conversation between Henley and Defendant after the shooting in which Henley told Defendant "that he didn't have to shoot him or he wasn't supposed to shoot him."

Defendant was charged by indictment with murder in the first degree (Count I), a class A felony in violation of Section 565.020,[1] armed criminal action (Count II), a felony in violation of Section 571.015, and attempted robbery in the first degree (Count III), a class B felony in violation of Sections 569.020 and 564.011. The case proceeded to a jury trial.

During voir dire questioning of a venireperson who had served on a jury in a civil case, defense counsel stated:

[T]raditionally, in a civil case, it's the preponderance—preponderance of the evidence. And what that means is—I'm sorry. I'll slow. What that means is—is that if it's slightly more than not, okay. If there's two sides and they're battling back and forth and you're not sure what happened but you're kind of thinking I'll lean this way just a little. If it's fifty-one percent to forty-nine percent or—that person or that side or the Plaintiff or Defendant or whatever would have successfully convinced you by a preponderance of the evidence. One more check puts them ahead. You understand the burden of proof is proof—proof more higher in a case like that?

At which point, the prosecutor objected to defense counsel engaging in a "lecture" with the venire comparing burdens of proof. The prosecutor noted that the proper questions to be asked were whether or not the venire could follow the beyond a reasonable doubt burden of proof applicable to the case. The trial court sustained the State's objection.

After the parties made their peremptory strikes, but before the venire was excused and the jury was sworn, both the State and Defendant raised *Batson*[2] challenges.

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

2. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (holding that under the Equal Protection Clause, a prosecutor may not challenge a potential juror solely on the basis of the potential juror's race); *see also Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (holding that under the Equal Protection Clause and *Batson*, a criminal defendant may not challenge a potential juror solely on the basis of the potential's juror's race).

Defendant challenged the State's peremptory strikes of black venirepersons Shirley Alexander (Alexander) and Amazie McCain (McCain). The State challenged Defendant's peremptory strike of white venireperson Mary Visintainer (Visintainer).

The prosecutor provided the following explanation for striking Alexander:

Your Honor, I struck her because she to me acted completely bored by the entire proceedings. I noticed once or twice her yawning. I noticed at least once when we took a brief, might have been a bench conference type of break or something and come back, that she actually, she rolled her eyes and looked disgusted that—because we were continuing on voir dire yesterday. And the same thing today, she looked pretty bored. And I have nothing written down for her. I believe that she did not respond in terms of raising her hand to general questions but other than that did not participate in voir dire in any way.

In response to this explanation, defense counsel suggested that the description of being "bored" and "tired" and concerned that the process "was going on, on and on" applied to a lot of people. Defense counsel identified Visintainer as being similarly situated because he "addressed her or else she wouldn't have spoken to any great degree." The prosecutor disagreed that Visintainer was similarly situated because she responded to some questions that he had. Also, the trial court noted that Visintainer was in the court's line of sight as the court looked at the jury box and Visintainer "always seemed to be very attentive through the proceedings."

The prosecutor provided the following explanation for striking McCain:

Your Honor, I struck her for basically the same reason as I struck [Alexander]. I—as I was speaking to everybody, I—

I—frankly, I noticed the entire background there in the seats. None of them appeared to be really particularly paying much attention. The two ladies, you know, I noticed them sort of exchanging glances occasionally. Again, like they were bored. In terms of other people who were similarly situated, I would note that there were two other people. At least one of which stated on the record that she was bored. But those two people were struck for cause. If they weren't, I probably would have struck them peremptorily for the same reason. You know, if they couldn't give us a couple of hours of their time, you know, I don't think they would make very good jurors for either side.

In response to this explanation, defense counsel noted that another white venireperson, Janice Rozmirsky (Rozmirsky), did not speak during his questioning and maybe answered a few of the prosecutor's questions, but she did not put forward "any great information." Defense counsel also stated again that if someone was not involved and appeared to be tired, then that description applied to "every single person out there including the attorneys."

The prosecutor replied to defense counsel's response by indicating that he did not get the same feeling from Rozmirsky anytime that he looked back at her. She was sitting over his shoulder so he did not observe her as much as the people in his line of sight. When he did turn around to look at the people behind him, Rozmirsky appeared to be alert, and he did not notice the same thing as in the others, "being bored."

The trial court found the State's reasons for using peremptory strikes against Alexander and McCain to be proper, well-founded, and based on reasons that had nothing to do with the race of the panel

member. Therefore, the court denied Defendant's challenges to those peremptory strikes.

Defense counsel provided the following explanation for striking Visintainer, a special education teacher:

Actually, I wanted to keep [Visintainer]. The Defendant felt as though that that would be a proper strike; I agree with him. I found it to be marginal except that my specific questioning as I re-looked at her, my specific questioning with regard to learning disabilities and someone's—someone testifying. Although I think it was a point that could be made with everyone else, it could be a point that would actually offend her, that I'm addressing her students as being different or not being able to do certain things. It could also have created a reaction like well, by gosh my students would be able to come forward and testify if they were not guilty. So in retrospect, I agreed with my client.

In response to this explanation, the prosecutor stated that he did not "see any of that in terms of any responses that she had."

Regarding defense counsel's explanation for the peremptory strike of Visintainer, the trial court stated that the court's notes did not support any of the things mentioned by defense counsel and that the explanation appeared to be "grounded on a level that's just a bit more speculative" than is acceptable. Therefore, the court sustained the State's challenge to that peremptory strike.

Subsequent to the trial court's ruling on the State's challenge, defense counsel provided the following clarification of his explanation for his peremptory strike of Visintainer:

I had placed her on my good list and it was my client who said that he had a feeling about her. And then in retrospect when I looked at her, I thought, well, considering the questioning that I did to her about her profession, I didn't see any problem. I didn't see her react that way. It was just simply the—the well, you never know. The way I addressed her with regard to her students and all of that on a very critical issue of the right not to testify, it was more of a—a—of my opportunity to have everyone else focus on those types of changes differences or—or difficulties but not to challenge [Visintainer] and her students. So upon my client's suggestion, I then thought well that might be a good choice. So just to make the record complete, I didn't think there was anything that anyone would have seen and I didn't either, that made her—that seemed like she was offended.

After a five-day trial, a jury found Defendant guilty as charged. Defendant made a motion for judgment of acquittal at the close of the State's evidence and at the close of all the evidence and a motion for new trial. The trial court denied all three motions. The trial court entered a judgment in accordance with the jury verdict and sentenced Defendant to concurrent terms of life imprisonment without eligibility for probation or parole on Count I, twenty-five years' imprisonment on Count II, and fifteen years' imprisonment on Count III.

*Discussion*

Defendant raises three points on appeal. In his first point, Defendant argues that the trial court clearly erred in sustaining the State's *Batson* challenge to Defendant's peremptory strike of Visintainer.

We give the trial court's determination on a *Batson* challenge great deference and will not set it aside unless it is clearly erroneous. *State v. Costello,* 101

S.W.3d 311, 312 (Mo.App. E.D.2003). A finding is clearly erroneous when, even if there is some evidence to support it, we are left with the definite and firm conviction from the evidence as a whole that a mistake has been made. *Id.* A party may not challenge an explanation on appeal that the party has not properly challenged in the trial court. *Id.*

■ The procedure for *Batson* challenges includes three stages. *State v. Marlowe*, 89 S.W.3d 464, 468 (Mo. banc 2002). First, the opponent must raise a *Batson* challenge with regard to one or more specific venirepersons struck and identify the cognizable racial group to which the venireperson or persons belong. *Id.* This challenge must be made before the venire is excused and the jury is sworn. *Id.*

■ Second, the proponent of the strike must provide a reasonably specific and clear race-neutral explanation for the strike. *Id.* The initial explanation is deemed race-neutral unless a discriminatory intent is inherent in the proponent's explanation, even if that explanation has a disparate impact on minority venirepersons. *Id.* Also, the explanation need not be persuasive. *Id.* at 469.

■ Third, if an acceptable explanation for the strike is articulated, the opponent must show that the proponent's proffered explanation was merely pretextual and that the strike was racially motivated. *Id.* At this stage, the persuasiveness and the plausibility of the explanation become relevant. *Id.* While parties are free to use "horse sense" and "play hunches" in exercising peremptory strikes so long as the factors they rely on are race-neutral, objective explanations for exercising such strikes against minority venirepersons are the most persuasive. *Id.* at 470. Post-hoc explanations are irrelevant. *Id.* at 469.

The opponent of the strike bears the burden of proving purposeful discrimination. *Id.*

■ In determining pretext, the trial court should consider the totality of the facts and circumstances surrounding the case; however, several factors should be considered. *Id.* at 470. The first factor is the existence of similarly situated jurors of another race who were not struck. *Id.* at 469. Although not dispositive, this factor is so relevant in determining pretext that it is crucial. *Id.* A second factor is the degree of logical relevance between the proffered explanation and the case to be tried. *Id.* A third factor is the attorney's credibility, based on the attorney's demeanor or statements during voir dire, and the trial court's past experiences with the attorney. *Id.* A fourth factor is the demeanor of the venireperson who is the subject of the strike. *Id.* at 470.

The State satisfied the first stage of the *Batson* inquiry regarding the peremptory strike of Visintainer. The prosecutor noted that all of Defendant's peremptory strikes were of white venirepersons. Defendant then satisfied the second stage. Defense counsel provided a race-neutral explanation for the strike by indicating his concern that he may have offended Visintainer by questioning her about the abilities of her students.

■ Next, we must determine whether or not defense counsel's explanation was pretextual. During voir dire, the following exchange occurred between defense counsel and Visintainer:

> [Counsel]: .... You said yesterday that you had dealt with individuals with learning disabilities?
>
> [Visintainer]: Right.
>
> [Counsel]: That is sometimes a—blanket description. That actually is probably overused in a blanket description

because you probably deal with individuals that have a wide range of—of abilities?

[Visintainer]: Disability.

[Counsel]: Some—some, exceeding hours (sic) in some areas. But others, the reason that you're dealing with them might not be—might have to be dealt with in a special way, right?

[Visintainer]: Right.

[Counsel]: Okay. And times obviously, that may be someone's verbal skills, is that correct?

[Visintainer]: Correct.

[Counsel]: And their ability to articulate their point or not?

[Visintainer]: That's right.

[Counsel]: And obviously, that's one possibility of a reason that a person may choose not to testify is purely because of their ability to make their point?

[Visintainer]: Yes, it could be.

[Counsel]: Also, you have individuals that may, with regard to being cross-examined by somebody with as much experience as [the prosecutor]?

[Visintainer]: That could be.

[Counsel]: Factoring that in as I had said in the beginning is because they also had something to hide?

[Visintainer]: Could be.

[Counsel]: Whatever the factors that maybe that you think of or not think of and I think, everyone agrees with [another venireperson] that in the back of your mind you're going to be quizzable about what's going on. You're quizzable as to why we're standing—still standing up here talking to you at this late hour. But the bottom line is whether or not you believe the State is proven their case beyond a reasonable doubt and if they haven't your verdict would be?

[Visintainer]: Not guilty.

[Counsel]: And any other factor that may come in or not or whatever, you would be able to not hold that against [Defendant]?

[Visintainer]: Right.

[Counsel]: Okay. And whether—whatever my decision might be, you're not going to hold that against [Defendant]?

[Visintainer]: Right.

First, we note that there were no similarly situated venirepersons. Regarding Visintainer's demeanor, a review of the exchange between defense counsel and Visintainer reveals no objective indication that Visintainer was offended by defense counsel's questions. Rather, Visintainer's responses indicate that she agreed with the premises of defense counsel's questions. The prosecutor also stated that he did not observe anything that suggested Visintainer was offended by defense counsel's questions. Further, in his clarification, defense counsel even stated that he did not see anything that appeared like Visintainer was offended.

■ *Batson* requires the trial judge to embrace a participatory role in voir dire, noting the subtle nuance of both verbal and nonverbal communication from each member of the venire and from the attorneys. *State v. Antwine*, 743 S.W.2d 51, 64 (Mo. banc 1987). As such, the trial court found defense counsel's explanation to be unsupported by the court's notes. The trial court also found the explanation to be speculative. We defer to the trial court's findings as it is in the best position to evaluate the credibility of the witnesses. *Id.* at 66. Although Defendant argues that he used a "race-neutral hunch" in exercising the peremptory strike, the trial court obviously rejected his explanation and by implication was not persuaded by it. We defer to the trial court's assessment of the legitimacy of the explanation.

We are not left with the definite and firm conviction from the evidence as a whole that a mistake has been made. Because of the great deference accorded trial courts in their determination of *Batson* challenges based on the totality of the facts and circumstances, we cannot conclude that the trial court clearly erred in sustaining the State's *Batson* challenge to Defendant's peremptory strike of Visintainer. Accordingly, Defendant's point one on appeal is denied.

■ In his second point on appeal, Defendant argues that the trial court clearly and plainly erred in overruling Defendant's *Batson* challenge to the State's peremptory strikes of Alexander and McCain.

· ■ Defendant did not raise this issue in his motion for new trial. Therefore, his claim is not preserved for appellate review. *See* Rule 29.11(d).[3] A claim not properly preserved for appellate review may be considered for plain error at our discretion. Rule 30.20. Under this standard, reversal requires a plain error affecting a substantial right that results in manifest injustice or miscarriage of justice. *Id.* Plain error review is to be used sparingly. *State v. Knese*, 985 S.W.2d 759, 770 (Mo. banc 1999). A defendant bears the burden of demonstrating manifest injustice or miscarriage of justice. *State v. Tokar*, 918 S.W.2d 753, 770 (Mo. banc 1996).

■ We conclude that Defendant has not met his burden of demonstrating manifest injustice or miscarriage of justice. Even if Defendant had preserved his claim for review, we conclude that the trial court did not clearly err in overruling Defendant's *Batson* challenge to the State's peremptory strike of Alexander and McCain.

Again, the issue on appeal concerns the third stage of a *Batson* challenge. Defendant argues that Rozmirsky was a similarly situated white venireperson not struck by the State. Defendant characterizes Rozmirsky as being similarly situated because she did not actively volunteer information during the voir dire process. However, this reason was not the only explanation given by the prosecutor for striking Alexander and McCain, and therefore Rozmirsky was not similarly situated.

■ Regarding Alexander, the prosecutor explained that she "acted completely bored" by the entire proceedings, that he noticed once or twice her yawning and that she rolled her eyes and looked disgusted after a break because they were continuing on with voir dire. Regarding McCain, the prosecutor explained that he struck her for basically the same reasons as he struck Alexander, including not paying much attention. The prosecutor also noticed McCain exchanging glances occasionally with Alexander as if they were bored. Inattentiveness, demeanor and attitude are proper explanations for exercising a peremptory challenge. *State v. Brown*, 998 S.W.2d 531, 546 (Mo. banc 1999). The prosecutor also indicated that when he looked at Rozmirsky, she appeared to be alert, and he did not notice her "being bored," as he noticed with Alexander and McCain.

Further, the prosecutor stated that in terms of other people who were similarly situated, he noted two other people, at least one of whom stated on the record that she was bored, but those two people were struck for cause. If they were not, the prosecutor "probably would have struck them peremptorily for the same reason."

Defendant argues that the prosecutor was required to bring Alexander and McCain's demeanor to the trial court's attention prior to the peremptory strikes,

---

**3.** All rule references are to Mo. R.Crim. P.   2004, unless otherwise indicated.

citing *State v. Metts*, 829 S.W.2d 585, 588 (Mo.App. E.D.1992). Defendant's argument is misplaced. In *Metts*, we stated that the State should inform the court of any perceived inattentiveness on the part of a venireperson so that a more complete record could be presented to the reviewing court. *Id.* However, failure to follow this suggestion does not constitute reversible error; rather, it merely complicates a fact decision that the trial court must decide. *State v. White*, 913 S.W.2d 435, 437 (Mo. App. E.D.1996). Nevertheless, because determining who is and is not attentive requires subjective judgments that are particularly susceptible to the kind of abuse prohibited by *Batson*, we strongly recommend counsel to bring concerns of inattentiveness on the part of a venireperson to the court's attention at the earliest opportunity to make a more complete written record. *See Metts*, 829 S.W.2d at 587 (quoting *U.S. v. Sherrills*, 929 F.2d 393, 395 (8th Cir.1991)).

The trial court found the prosecutor's explanations regarding Alexander and McCain to be proper, well-founded, and based on reasons that have nothing to do with the race of the panel member. The trial court had the opportunity to assess the prosecutor's credibility, based on his demeanor and statements during voir dire, and the record does not indicate that the trial court clearly erred in its assessment.

Considering the totality of the facts and circumstances surrounding the case, we conclude that the trial court did not plainly or clearly err in overruling Defendant's *Batson* challenge to the State's peremptory strikes of Alexander and McCain. Accordingly, Defendant's point two on appeal is denied.

In his third point on appeal, Defendant argues that the trial court abused its discretion in sustaining the State's objection to defense counsel's attempt to compare for the venire the difference between the civil and criminal burdens of proof.

The trial court is vested with wide discretion in the conduct of voir dire. *State v. Oates*, 12 S.W.3d 307, 310 (Mo. banc 2000). We review rulings by the trial court with regard to the conduct of voir dire for an abuse of discretion. *Id.* at 311. Where a party claims that the trial court abused its discretion in conducting voir dire, the party has the burden of showing a "real probability" that he was prejudiced by the abuse. *Id.*

Defendant has not shown a real probability that he was prejudiced by the trial court's sustaining the State's objection to defense counsel's attempt to compare for the venire the difference between the civil and criminal burdens of proof. Defendant argues that he needed to do so because several venirepersons had previously served on juries in civil cases and he needed to ensure that they understood the burden of proof beyond a reasonable doubt is higher than the burden of proof by a preponderance of the evidence. However, prior to defense counsel's attempt at comparison, the venireperson being questioned indicated that she did not remember the term "preponderance" from her experience serving on the jury in a civil case. Thus, the comparison may have resulted in confusing the venire by distracting them from the applicable burden of proof in the criminal case.

Further, at the beginning of voir dire, the trial court asked the venire if there were any members who would not be willing to follow all of the instructions that the court would give to the jury. No veniremembers raised their hands indicating that they would not be willing to follow the instructions. The court later instructed the jury on burden of proof by giving Instruction No. 4, based on MAI–CR 3d 302.04. Also, during voir dire, defense counsel had ample opportunity to discuss

the burden of proof beyond a reasonable doubt with the venire panel, and he referred to the court's instruction in doing so.

Accordingly, the trial court did not abuse its discretion in sustaining the State's objection to defense counsel's attempt to compare for the venire the difference between the civil and criminal burdens of proof. Defendant's point three on appeal is denied.

### Conclusion

The judgment of conviction and sentence of the trial court is affirmed.

GARY M. GAERTNER, P.J., and BOOKER T. SHAW, J., concur.