

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| Respondent, | ) WD81879 |
| v. | ) |
| | ) OPINION FILED: |
| | ) December 10, 2019 |
| RAMON D. BOYD, | ) |
| | ) |
| Appellant. | ) |

### Appeal from the Circuit Court of Jackson County, Missouri
### The Honorable Jalilah Otto, Judge

### Before Special Division: Mark D. Pfeiffer, Presiding Judge, and
### Edward R. Ardini, Jr., and Thomas N. Chapman, Judges

Mr. Ramon D. Boyd ("Mr. Boyd") appeals from the judgment of his conviction and sentence, following a jury trial in the Circuit Court of Jackson County, Missouri ("trial court"), for voluntary manslaughter, assault in the second degree, two counts of armed criminal action, and leaving the scene of a shooting. Mr. Boyd asserts three points on appeal: (1) that the trial court clearly erred in denying his *Batson*[1] challenge to the State's strike of an African-American venireperson; (2) that the trial court clearly erred in granting the State's reverse-*Batson* challenge

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

to the defense's strike of a Caucasian venireperson; and (3) that the trial court committed evidentiary error relating to the admission of Boyd's girlfriend's cell phone records. We affirm.

## Facts and Procedural History[2]

On New Year's Eve 2015, friends Kierra Ramsey and Destynie Wright planned to go to a party. After getting ready, they left Ms. Ramsey's mother's house in Ms. Wright's car. The party ended at about 1:00 a.m. When they left, Ms. Ramsey was surprised that her boyfriend, Sederick Jones, was there. He said, "Come on, let's go," and he and Ms. Ramsey and Ms. Wright walked out of the building together. They got in Ms. Wright's car, with Ms. Wright in the driver's seat, Ms. Ramsey in the front passenger seat, and Mr. Jones in the back seat on the passenger side. They were in the car for about an hour, during which time Ms. Wright and Mr. Boyd, Ms. Wright 's boyfriend (who also went by the nickname TK), were texting each other.[3]

When Ms. Ramsey decided to leave with Mr. Jones, she got her bags out of Ms. Wright's car, moved them to Mr. Jones's car, which was parked next to Ms. Wright's car, and got in on the passenger side of Mr. Jones's car. Mr. Jones was standing on the driver's side of Ms. Wright's car, talking to her. As Mr. Jones walked between the cars, he said something, and Ms. Ramsey leaned out and asked, "What are you talking about?" She saw "a person standing back there" and then heard gunshots. Mr. Boyd was the shooter. Ms. Ramsey was shot numerous times, and Mr. Jones started running. Ms. Ramsey heard more gunshots. Ms. Ramsey was shot in the arm, chest, and legs, and she underwent three surgeries during her month-long

---

[2] "On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." *State v. Shaw*, 541 S.W.3d 681, 684 n.1 (Mo. App. W.D. 2017) (internal quotation marks omitted). On appeal, Boyd does not contest the sufficiency of the evidence to convict him of the crimes with which he was charged.

[3] Text messages obtained from Ms. Wright's cell phone included texts between Ms. Wright and Boyd. On January 1, 2016, at 2:16 a.m., Boyd texted Ms. Wright to "keep [Jones] there," and Ms. Wright responded, "Okay." At 2:27 a.m., Ms. Wright texted Boyd, "Yes TK, come get him." At 2:30 a.m., Ms. Wright texted Boyd, "PASSENGER SIDE," followed by "NOW TK" and "U007." At 2:38 a.m., Boyd sent Ms. Wright a text message, "Here." Shortly after this exchange, Boyd shot Jones four times, killing Jones.

hospital stay. Mr. Jones died of multiple gunshot wounds at the scene; his body was found on the ground at the front left quarter panel area of his vehicle.

After Ms. Ramsey was taken to the hospital, her mother informed police that Ms. Ramsey had been with Ms. Wright the previous evening. The police obtained an address for Ms. Wright. When police arrived, Ms. Wright was not there, but police later learned that the car Ms. Wright had been driving was parked next door to her sister's house.

The police went to Ms. Wright's sister's house and made contact with Ms. Wright. Ms. Wright voluntarily agreed to go with the police to the police station and give a statement. As they were leaving the residence, Ms. Wright's sister reminded Ms. Wright not to forget her cell phone and handed the phone to one of the detectives as they were walking out.

At the station, Ms. Wright lied and told police that she did not know who the shooter was. She also stated that she had performed a "hard reset" on her cell phone to permanently delete all the data on her phone. Immediately thereafter, the police applied for and received a search warrant to search the contents of the phone. After the cell phone data was extracted, relevant and incriminating text messages between Ms. Wright and Mr. Boyd from the evening of the crimes were recovered. Ms. Wright and Mr. Boyd were arrested on March 1, 2016.

The State charged Mr. Boyd with one count of the class A felony of murder in the first degree for knowingly causing the death of Sederick Jones by shooting him, one count of the class A felony of assault in the first degree for shooting at Ms. Ramsey, two counts of the unclassified felony of armed criminal action, and one count of class A misdemeanor of leaving the scene of a shooting.

At trial, Mr. Boyd testified in his own defense, alleging that he shot Mr. Jones in self-defense. The jury found Mr. Boyd guilty beyond a reasonable doubt of the class B felony of

3

voluntary manslaughter, the class C felony of assault in the second degree, two counts of armed criminal action, and the class A misdemeanor of leaving the scene of a shooting. After additional evidence in the penalty phase, the jury returned the following punishment recommendations: twelve years' imprisonment for voluntary manslaughter, five years' imprisonment plus a fine in an amount to be determined by the trial court for assault in the second degree, five years' imprisonment for each count of armed criminal action, and one year's imprisonment in the county jail plus a fine in an amount to be determined by the trial court for leaving the scene of a shooting. The trial court sentenced Boyd in accordance with the jury recommendations except that the court did not impose any fines. The trial court ordered that the sentences run consecutive to one another for a total of twenty-eight years' imprisonment.

Mr. Boyd timely appealed.

### Point I – Denial of Batson Challenge to Venireperson No. 23

In Mr. Boyd's first point, he asserts that the trial court clearly erred in denying his *Batson* challenge to the State's strike of African-American Venireperson No. 23.[4]

### Standard of Review

The standard of review of a trial court's findings on a *Batson* challenge is clear error. *State v. Meeks*, 495 S.W.3d 168, 172 (Mo. banc 2016). "The trial court's findings are clearly erroneous if the reviewing court is left with the definite and firm conviction that a mistake has been made." *Id.* (internal quotation marks omitted). If the trial court's ruling on a *Batson* challenge is clearly erroneous, it will be set aside. *Id.* A trial court's determination that a peremptory strike was made on racially neutral grounds is entitled to great deference on appeal. *State v. Cole*, 71 S.W.3d 163, 172 (Mo. banc 2002). "Further, because of the subjective nature

---

[4] The jury that was empaneled in this case was composed of venirepersons numbered 1, 3, 5, 7, 12, 15, 17, 18, 20, 22, 25, 30, and alternates 37 and 45.

4

of peremptory challenges we place great reliance in the trial court's judgment when it comes to assessing the legitimacy of the [S]tate's explanation." *State v. Morrow*, 968 S.W.2d 100, 114 (Mo. banc 1998) (internal quotation marks omitted).

**Analysis**

"The Equal Protection Clause in the United States Constitution prohibits parties from using a peremptory challenge to strike a potential juror on the basis of race." *Meeks*, 495 S.W.3d at 172. "In *Batson*, the Supreme Court described a three-step, burden-shifting process for challenging a peremptory strike on this basis." *Id*. (citing *Batson v. Kentucky*, 476 U.S. 79, 96-98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). "The Supreme Court, however, 'decline[d] . . . to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges.'" *Id*. (quoting *Batson*, 476 U.S. at 99). To fill that void, the Missouri Supreme Court articulated a three-step procedure for trial courts to use in evaluating a *Batson* challenge:

> First, the defendant must raise a *Batson* challenge with regard to one or more specific venirepersons struck by the [S]tate and identify the cognizable racial group to which the venireperson or persons belong. The trial court will then require the [S]tate to come forward with reasonably specific and clear race-neutral explanations for the strike. Assuming the prosecutor is able to articulate an acceptable reason for the strike, the defendant will then need to show that the [S]tate's proffered reasons for the strikes were merely pretextual and that the strikes were racially motivated.

*Id*. at 173 (quoting *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992)).

As a preface to making the *Batson* challenges at Mr. Boyd's trial, defense counsel observed that out of the twenty-four persons remaining in the jury pool, "the State elected to use four out of their six peremptory strikes to strike four of the six African Americans." In point of fact, defense counsel made *Batson* challenges to all of the State's peremptory strikes of these four African-American venirepersons and the trial court **granted three** of defense counsel's

5

*Batson* challenges and only denied defense counsel's *Batson* challenge as to Venireperson No. 23. Specifically, at trial, defense counsel made a *Batson* challenge to the State's strike of Venireperson No. 23, whom counsel identified as African American.

In response to Mr. Boyd's *Batson* challenge, the prosecutor stated:

No. 23 made extensive comments about—the defense elected to get into some of the facts of their case in voir dire, including not calling 911. And 23 specifically talked about cultural reasons why you might not do that and why that might be okay similarly to Juror No. 22, which was the reason that both of them were peremptory strikes by the State.

Defense counsel responded that when she asked the venire panel if they could imagine a situation where someone would not call 911 under these circumstances, there was "a lot of feedback from white and black jurors alike that they can imagine a circumstance where someone would not necessarily call 911." Defense counsel stated that Venireperson No. 23 "specifically referenced that there could be cultural reasons why someone wouldn't call the police." Defense counsel asserted: "I think that there is not a race neutral reason for either of those two jurors [Venireperson No. 22 and Venireperson No. 23] to be struck. In fact it appears the reason that it is being offered is that it is race-based."

The prosecutor disagreed that the reason was race-based, stating that her strikes were based on "the responses to why you wouldn't call 911, not because of [the venireperson's] race."

The trial court responded that it recalled that line of questioning, and "there were quite a few people that indicated there were a number of reasons as to why they could concede when 911 would not be called." The trial court deferred ruling on the strike until the trial court could review its voir dire notes.

The trial court explained its position regarding *Batson* challenges:

Here's the thing, I take *Batson* challenges very seriously as does every court. Your jury pool is going to be made up of very diverse individuals. And so

6

simply because [Boyd] made a *Batson* challenge that four of the six strikes were African American and [the State] turn[s] around and say[s] well five of your six strikes were white.

I mean, I'm not going to get in the business of doing that because I do take *Batson* challenges quite seriously, as does every judge in this courthouse.

So we all get our own perceptions of people. We all get our own feelings about people. But what I'm looking at is real concrete things that people said, that people did, that you can articulate and preserve in a record setting.

When the trial court returned to consider the strike of Venireperson No. 23, the trial court observed that the responses of Venireperson No. 22 and Venireperson No. 23 were similar, "but they're a little bit different in the fact that I think it was No. 23 and she said, it's a cultural thing. Your best move may be to exit the scene and calm down and relax. And maybe that's why you don't call the police right away."[5] Whereas "No. 22 says the responsible thing to do is to call the police to tell your side of things; otherwise, you leave your fate to someone else."[6] The trial court decided to handle the strikes of Venireperson No. 22 and Venireperson No. 23 separately

---

[5] During voir dire, defense counsel asked the venire panel to raise their hand if they believed "that it is completely unreasonable and a sign of guilt not to call the police when a shooting takes place. Raise your hand if you think that is crazy, unreasonable[,] and must mean you are guilty if you do not call the police personally following a shooting." Venireperson No. 23 raised her hand. After a number of panel members responded to defense counsel's question, Venireperson No. 23 stated:

> Yeah, I originally voted saying that yes, I couldn't see, but I think considering the situation, and it is a cultural thing—
> . . . .
> I can see in a situation like that, you would not want to call the police right there in that moment. However, you do want to take ownership in that situation, but you don't want to put yourself in a situation where you're calling the police in that moment. Your best mind is to exit the scene immediately and find somewhere safe to calm down.

[6] Venireperson No. 22 stated:

> [T]he responsible thing to do is notify authorities, that way you can get your side of the story heard first—
> . . . .
> That's what you would want to do. Hey, this is what happened. I had to defend myself. This is what it is. Otherwise, you leave it up to somebody else to decide your fate.

7

and asked the prosecutor to state "one more time" the State's race-neutral reason for striking Venireperson No. 23. The prosecutor answered:

> Actually, on 23 I have two reasons. One was the better to wait, calm down—the response she gave to why you would not call 911.
>
> The second one was that she had a family member that was prosecuted by Jackson County. I think she has three family members that are incarcerated, but specifically one that was prosecuted by my office. So those would be the two different race neutral reasons I have for 23.

The trial court asked if defense counsel had anything further on Venireperson No. 23, and defense counsel responded, "No"; whereupon the trial court denied Boyd's *Batson* challenge to Venireperson No. 23.

The prosecutor's collective reasons for the peremptory strike of Venireperson No. 23 are sufficiently race-neutral. That Venireperson No. 23's family members were prosecuted by the Jackson County prosecutor's office and three family members were incarcerated has long been deemed by Missouri courts to be a facially race-neutral reason for a peremptory strike. "[T]he arrest, prosecution, or incarceration of a relative is a race-neutral reason for exercising a peremptory challenge." *State v. Johnson*, 930 S.W.2d 456, 461-62 (Mo. App. W.D. 1996). *See also State v. Murray*, 428 S.W.3d 705, 713 (Mo. App. E.D. 2014) ("[H]aving an incarcerated family member is a race-neutral reason for a peremptory strike."); *State v. Fritz*, 913 S.W.2d 941, 946 (Mo. App. W.D. 1996) (finding State's explanation for peremptory strike that potential juror had a family member prosecuted by the Jackson County prosecutor's office was race-neutral explanation).

Once the State articulated a race-neutral basis for the strike, it was Mr. Boyd's burden to show that all of the State's explanations for the strike of Venireperson No. 23 were pretextual. Defense counsel responded to the State's initial explanation by arguing that Venireperson No. 23

8

"specifically referenced that there could be cultural reasons why someone wouldn't call the police" and asserting, "I think that there is not a race neutral reason." However, when the trial court asked the prosecutor to state "one more time" the State's race-neutral reason for striking Venireperson No. 23, the prosecutor gave the additional reasons that Venireperson No. 23 had a family member prosecuted by the Jackson County prosecutor's office and had three incarcerated family members, both of which are race-neutral reasons for a peremptory strike. When the trial court asked if defense counsel had anything further on Venireperson No. 23, defense counsel responded, "No"; whereupon the trial court denied Mr. Boyd's *Batson* challenge. It is clear from the record that the trial court had before it race-neutral reasons for striking Venireperson No. 23, particularly those not challenged by Mr. Boyd.

The trial court's ruling on Mr. Boyd's *Batson* challenge was carefully and considerately made by the trial court and was not clearly erroneous.

Point I is denied.

### Point II – Granting of Reverse-*Batson* Challenge to Venireperson No. 12

In Mr. Boyd's second point, he asserts that the trial court clearly erred in granting the State's reverse-*Batson* challenge[7] to his strike of Caucasian[8] Venireperson No. 12.

### Standard of Review

In reviewing a trial court's decision concerning a reverse-*Batson* challenge, we accord the trial court great deference because its findings of fact largely depend on its evaluation of credibility and demeanor. *State v. Letica*, 356 S.W.3d 157, 164 (Mo. banc 2011) (citing *State v.*

---

[7] Challenges made by the State in response to a defendant's allegedly purposeful discrimination in the exercise of peremptory strikes are known as reverse-*Batson* challenges. *State v. Letica*, 356 S.W.3d 157, 164 (Mo. banc 2011).

[8] "*Batson* is not solely applicable to racial minorities, but rather, applies to the racially motivated removal of any venireperson regardless of his or her race because of a need to eradicate the use of racial stereotypes of any kind from the jury process." *State v. Holloway*, 877 S.W.2d 692, 695 (Mo. App. E.D. 1994).

9

*Bateman*, 318 S.W.3d 681, 687 (Mo. banc 2010)). We will set aside the trial court's findings of fact on a reverse-*Batson* challenge only if they are clearly erroneous. *Id*. "Clearly erroneous means the reviewing court is left with the definite and firm conviction that a mistake has been made." *Id*.

### Analysis

Mr. Boyd argues that the trial court clearly erred in granting the State's reverse-*Batson* challenge to his peremptory strike of Venireperson No. 12. He contends that he gave race-neutral reasons to strike Venireperson No.12 and that the strike was not racially motivated.

There are three steps in raising a reverse-*Batson* challenge:

> [O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one)[,] the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two); if a race-neutral explanation is tendered, the trial court then must decide whether the opponent of the strike has proven purposeful prohibited discrimination (step three).

*Id*. (citing *Kesler-Ferguson v. Hy-Vee, Inc.*, 271 S.W.3d 556, 559 (Mo. banc 2008)). "In determining pretext, the main consideration is the plausibility of the [striking party's] explanations in light of the totality of the facts and circumstances surrounding the case." *Id*. (internal quotation marks omitted).

The State made a reverse-*Batson* challenge on the basis of race to defense counsel's strike of Venireperson No. 12, who was identified as "white" or Caucasian.

Defense counsel stated that she struck Venireperson No. 12 because "he appeared to be inattentive. Did not make eye contact with me. Rolled his eyes on more than one occasion and general demeanor."[9]

---

[9] Of course, these sorts of observations are not found in a trial transcript that this tribunal reviews on appeal and, absent a concession from opposing counsel or the trial court, we do not know that the juror was acting in the

10

The prosecutor responded that the defense's reason was pretextual because the venireperson's demeanor "was the reason I gave for No. 1 that was not sufficient. So if it's not sufficient for the State, I don't think it's sufficient for the defense."[10]

"Inattentiveness has been considered a racially-neutral reason for exercising a peremptory challenge." *State v. Brown*, 998 S.W.2d 531, 544 (Mo. banc 1999) (citing *State v. Antwine*, 743 S.W.2d 51, 67 (Mo. banc 1987); *State v. White*, 913 S.W.2d 435, 437 (Mo. App. E.D. 1996)). Likewise, a venireperson avoiding eye contact with prosecutor has been considered a sufficient race-neutral explanation for exercising a peremptory challenge. *State v. Weaver*, 912 S.W.2d 499, 509 (Mo. banc 1995) (finding State's reasons to strike venireperson, including on lack of eye contact with the prosecutor, were race-neutral); *State v. Tolliver*, 750 S.W.2d 624, 628 (Mo. App. S.D. 1988) (citing *United States v. Cartlidge*, 808 F.2d 1064, 1070 (5th Cir. 1987), and listing other explanations held to be sufficient). *See also State v. Miller*, 162 S.W.3d 7, 16 (Mo. App. E.D. 2005) (finding State's explanation that venireperson "acted completely bored," yawned, and "rolled her eyes and looked disgusted" because voir dire was continuing was race-neutral). Thus, assuming the trial court did not conclude that defense counsel's reasons for the peremptory strike of Venireperson No. 12 were contrived, they were race-neutral.[11] The State did not offer a showing on the record that racial discrimination was the motivating factor for Mr. Boyd's peremptory strike.

---

fashion described by defense counsel. This is one of the reasons this court gives so much deference to the trial court's rulings relating to such physical observations at the trial below.

[10] This response (which is legally *non*-responsive) is indicative of the type of bickering amongst both defense counsel and the prosecuting attorney at trial. The colloquy between the attorneys and the trial court in the transcript reflected that the trial court was not impressed with either attorney's antics and noted that the bickering impacted the credibility of the arguments made by both.

[11] As mentioned previously, *see* n.9, it is entirely possible—if not probable—that the trial court found defense counsel's race-neutral representations about the juror's inattentiveness and eye-rolling to lack credibility as the trial court, unlike this court, was in the courtroom and able to make a determination of its own about these claims of inattentiveness or other body gestures by the venireperson. However, as we explain in our ruling, assuming *arguendo* that the race-neutral reasons provided were not contrived, the point on appeal fails for other reasons.

11

However, "the mistaken denial of a peremptory challenge in this case is harmless error under these facts." *Letica*, 356 S.W.3d at 165. "Peremptory strikes are statutory, granted pursuant to § 494.480, and are not required by the Missouri Constitution." *Id.* (citing *State v. Hall*, 955 S.W.2d 198, 204 (Mo. banc 1997)). "Similarly, there is no federal constitutional right to peremptory challenges." *Id.* (citing *Rivera v. Illinois*, 556 U.S. 148, 152, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009)). "'States may withhold peremptory challenges altogether without impairing the constitutional guarantee of an impartial jury and a fair trial.'" *Id.* (quoting *Rivera*, 556 U.S. at 152). "State law controls both the existence and exercise of peremptory challenges and the consequences of an erroneous denial of such a challenge." *Id.* "If there has been no federal constitutional violation, '[s]tates are free to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error *per se*' or whether 'the error could rank as harmless under state law.'" *Id.* (quoting *Rivera*, 556 U.S. at 162). The Missouri Supreme Court has stated that "[w]hile the defense counsel has a statutory right to use a peremptory challenge to strike a juror for non-discriminatory reasons, the erroneous denial of such a challenge merely resulted in the empaneling of an otherwise-qualified juror." *Id.* at 166.

The trial court granted the State's *Batson* challenge of Venireperson No. 12, finding that he could be fair and impartial:

> No. 12, fine, I'll grant you No. 12. I think his only indications he gave was that his brother was a victim of a home invasion. And he said he could set it aside and be fair and impartial. There were some other people that were also victims of crimes and could set it aside. But if you feel as though there is no race neutral reason to get rid of him, I will uphold that.

"Here, [Venireperson No. 12] was qualified to serve on the jury[,] and the record supports a determination [ ]he could remain fair and impartial." *Letica*, 356 S.W.3d at 166. "[Mr. Boyd] does not contend, nor has he demonstrated, that an unqualified person served on the jury that

12

convicted him. [Mr. Boyd], therefore, has failed to demonstrate that he was prejudiced by [Venireperson No. 12] serving on his jury." *Id.* Accordingly, the trial court's denial of Mr. Boyd's peremptory challenge, if it was error at all, constituted harmless error.

Point II is denied.

## Point III – Admission of Text Messages

In Mr. Boyd's third point, he asserts that the trial court erred in admitting the text messages from Ms. Wright's phone that were "obtained through an unconstitutional warrant." He contends that "the cell phone records were obtained after an unconstitutional seizure of her phone and an unconstitutional custodial interrogation [of Ms. Wright]." He further contends that Ms. Wright's statement "was used as probable cause to search the phone already in police custody thereby making it poisonous fruit."

## Standard of Review

"'The standard of review for the admission of evidence is abuse of discretion.'" *State v. Patrick*, 566 S.W.3d 245, 253 (Mo. App. W.D. 2019) (quoting *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011)). "The trial court has broad discretion in choosing to admit evidence[,] and we will not disturb this discretion unless it is against the logic of the circumstances and so unreasonable as to show a lack of careful consideration." *Id*. (citing *State v. Freeman*, 269 S.W.3d 422, 426 (Mo. banc 2008)). "'For evidentiary error to cause reversal, prejudice must be demonstrated.'" *Id*. (quoting *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009)). "'Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial.'" *Id*. (quoting *State v. Forrest*, 183 S.W.3d 218, 224 (Mo. banc 2006)).

**Analysis**

The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "'A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" *State v. Brown*, 382 S.W.3d 147, 158 (Mo. App. W.D. 2012) (quoting *Rakas*, 439 U.S. at 134). "And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." *Rakas*, 439 U.S. at 134 (citation omitted); *see also Alderman v. United States*, 394 U.S. 165, 174 (1969) (refusing to extend the exclusionary rule to protect a defendant from violation of a co-defendant's rights under the Fourth Amendment).

To be entitled to assert a Fourth Amendment violation, a defendant must meet two requirements. *State v. Faruqi*, 344 S.W.3d 193, 204-05 (Mo. banc 2011). "First, the defendant must have an actual, subjective expectation of privacy in the place or thing searched. Second, the expectation of privacy must be 'reasonable' or 'legitimate.'" *Id.* "The legitimacy or reasonableness of the expectation is measured 'by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id.* (quoting *Rakas*, 439 U.S. at 143 n.12). "[A] 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered." *Rakas*, 439 U.S. at 143 n.12.

14

Mr. Boyd relies on *State v. Clampitt*, 364 S.W.3d 605 (Mo. App. W.D. 2012), for the proposition that he had a reasonable expectation of privacy in the contents of his text messages stored in a cell phone belonging to Ms. Wright. However, *Clampitt* is distinguishable on its facts. In *Clampitt*, the defendant moved to suppress the text message content and detail for incoming and outgoing text messages obtained from *his* cell phone that the State obtained *from his cell phone provider* by use of four investigative subpoenas. *Id.* at 607. The trial court granted Clampitt's motion, finding he had a reasonable expectation of privacy in the text messages. *Id.* at 608. On appeal, the State contended it did not violate Clampitt's Fourth Amendment rights because Clampitt had no reasonable expectation of privacy in his text messaging records and thereby lacked standing to challenge the State obtaining such records by use of investigative subpoena. *Id.* at 609. The State also argued that Clampitt had no reasonable expectation of privacy in the contents of his text messages because the text messages were in the possession of a third party. *Id.* at 610. However, the third party in *Clampitt* was the cell phone service provider, a third-party intermediary through whom the messages were conveyed. The *Clampitt* court reasoned that "[c]ell phone providers have the ability to access their subscribers' text messages; however, the providers' ability to access those messages does not diminish subscribers' expectation of privacy in their text message communications." *Id.* at 611. The *Clampitt* court's decision was limited to text messages in the custody of a third-party *intermediary* and did not address text messages contained in the cell phone of a third-party *recipient*.

The United States Supreme Court has considered control as an important factor when determining whether a defendant has a reasonable expectation of privacy in a place or item. *See Rakas*, 439 U.S. at 154 (noting the distinction "between the Fourth Amendment rights of

15

passengers and the rights of an individual who has exclusive control of an automobile or of its locked compartments"); *United States v. Jacobsen*, 466 U.S. 109, 117, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (determining that "when an individual reveals private information to another," a reasonable expectation of privacy no longer exists because "he assumes the risk that his confidant will reveal that information to the authorities"); *State v. Demark*, 581 S.W.3d 69, 80 (Mo. App. W.D. 2019) ("Although, generally, electronic communications are considered effects similar to mail and carry a legitimate expectation of privacy, the expectation changes upon a person's voluntary decision to send communications to a stranger on the internet.").

Whether a person has an objectively reasonable expectation of privacy in his or her text messages contained in the cell phone of a third-party recipient is an issue of first impression in Missouri. However, the general rule is that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743-44, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *State v. Plunkett*, 473 S.W.3d 166, 176 (Mo. App. W.D. 2015). And, courts throughout the country have held that the sender of a text message or email has *no* privacy interest in the contents of that communication once it reaches the recipient.[12]

We find the Rhode Island Supreme Court's analysis in *State v. Patino*, 93 A.3d 40, 57 (R.I. 2014), persuasive. Patino had sent text messages to his girlfriend, some of which inculpated Patino in the death of her son. *Id*. at 45. The court noted that the most important

---

[12] *See Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001) (noting that a computer user "would lose a legitimate expectation of privacy in an e-mail that had already reached its recipient; at this moment, the e-mailer would be analogous to a letter-writer, whose 'expectation of privacy ordinarily terminates upon delivery' of the letter"); *State v. Griffin*, 834 N.W.2d 688, 696-97 (Minn. 2013) (concluding that defendant did not have reasonable expectation of privacy in cell phone records because he was not the subscriber associated with the phone); *Hampton v. State*, 763 S.E.2d 467, 471 (Ga. 2014) (finding no reasonable expectation of privacy in text messages where defendant could not show that phone belonged to him); *State v. Carle*, 337 P.3d 904, 910-11 (Or. Ct. App. 2014) (concluding that defendant did not have reasonable expectation of privacy in text message found on recipient's phone); *State v. Tentoni*, 871 N.W.2d 285, 289-90 (Wis. Ct. App. 2015) (holding defendant did not have an objectively reasonable expectation of privacy as he relinquished any claim to privacy in the text messages delivered to victim's phone).

16

factor in determining whether a person has a reasonable expectation of privacy in his text messages is "from whose phone the messages are accessed." *Id*. at 55. "Underlying this consideration is the element of control; that is to say, when the recipient receives the message, the sender relinquishes control over what becomes of that message on the recipient's phone." *Id*. Because the text messages were found on Patino's girlfriend's phone, and she had "full control of whether to share or disseminate the sender's [text] message[s]," Patino "did not have an objectively reasonable expectation of privacy in any text messages contained in [his girlfriend's] phone, whether sent by defendant, sent to defendant, or otherwise." *Id*. at 56, 57. The court held that Patino's reasonable expectation of privacy in the text messages did not extend to the messages contained on his girlfriend's phone, despite the fact that there existed an identical copy of the messages on his phone. *Id*. at 57. According to the court, "this is chiefly due to control; a cell phone user retains control over what becomes of the content on his or her phone, but entirely loses control of the messages contained on the phone of another." *Id*. "When applied to the case at hand, therefore, we conclude that defendant had no reasonable expectation of privacy, and thus no standing to challenge the search and seizure of [his girlfriend's] phone, its contents, and all derivatives therefrom." *Id*. (footnote omitted).

We thus conclude that Mr. Boyd did not have an objectively reasonable expectation of privacy in any text messages contained *in Ms. Wright's phone*. Ms. Wright's phone was not one of his personal effects; it was the property of a third party. It necessarily follows that, having no reasonable expectation of privacy *in Ms. Wright's phone* or the messages contained therein, Mr. Boyd did not have standing[13] to challenge the search and seizure thereof. *State v. Mosby*, 94 S.W.3d 410, 415-16 (Mo. App. W.D. 2003).[14]

---

[13] The use of the term "standing" to describe a criminal defendant's right to contest the legality of a search and seizure is something of a misnomer, as the United States Supreme Court in *Rakas v. Illinois*, 439 U.S. 128, 140,

Point III is denied.

## Conclusion

The trial court's judgment is affirmed.

/s/ *Mark D. Pfeiffer*
Mark D. Pfeiffer, Presiding Judge

Edward R. Ardini, Jr., and Thomas N. Chapman, Judges, concur.

---

99 S.Ct. 421, 58 L.Ed.2d 387 (1978), held that this determination "belongs more properly under the heading of substantive Fourth Amendment doctrine than under the heading of standing." "Nonetheless, our courts, including the Missouri Supreme Court, and the U.S. Supreme Court have continued to use 'standing' as a shorthand reference in describing whether a defendant is 'aggrieved' by the challenged search or seizure." *State v. Ramires*, 152 S.W.3d 385, 394 n.3 (Mo. App. W.D. 2004) (citations omitted).

[14] Mr. Boyd also claims that the allegedly coercive custodial interrogation of Ms. Wright rendered the fruits of that interrogation, namely the text messages, subject to suppression. We disagree. In Ms. Wright's direct appeal to this court, we concluded that "the trial court did not err[ ] by finding that the totality of the circumstances failed to establish that Wright was subjected to a custodial interrogation." *State v. Wright*, 585 S.W.3d 360, 369 (Mo. App. W.D. 2019). Furthermore, as we have discussed, Mr. Boyd had no legitimate expectation of privacy in the contents of Ms. Wright's phone; thus, he cannot assert a violation of his Fourth Amendment rights. "'[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.'" *State v. Stufflebean*, 548 S.W.3d 334, 343 (Mo. App. E.D. 2018) (quoting *Alderman v. United States*, 394 U.S. 165, 171-72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)).